ACCEPTED
15-25-00034-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
8/11/2025 4:55 PM
CHRISTOPHER A. PRINE
CLERK

FILED IN
15TH COURT OF APPEALS
AUSTIN, TEXAS
8/11/2025 4:55:55 PM
CHRISTOPHER A. PRINE
Clerk

**No. 15-25-00034-CV**

# IN THE COURT OF APPEALS
## FOR THE FIFTEENTH JUDICIAL DISTRICT

**The State of Texas,**

*Appellant,*

v.

**Alexandra Alvarez; Joshua LaFountain;**

**Dr. Christine Ellis, D.D.S.,**

*Appellees.*

**On Appeal from the 459th District Court, Travis County, Texas**

## BRIEF FOR RELATOR-APPELLEES

CHARLES S. SIEGEL
Texas Bar No. 18341875
CAITLYN SILHAN
Texas Bar No. 24072879
WATERS & KRAUS, LLP
3141 Hood Street, Suite 700
Dallas, Texas 75219
(214) 357-6244
(214) 357-7252 (fax)
siegel@waterskraus.com
csilhan@waterskraus.com

JAMES MORIARTY
Texas Bar No. 14459000
Law Offices of James R. Moriarty
4119 Montrose Blvd., Suite 250
Houston, Texas 77006
(713) 528-0700
(713) 528-1390 (fax)
jim@moriarty.com

JAMES "RUSTY" TUCKER
Texas Bar No. 20272020
Law Offices of James R. Tucker, P.C.
5522 Ellsworth Ave.
Dallas, Texas 75206
(214) 505-0097
(214) 599-8874 (fax)
rusty@rustytuckerlaw.com

**ATTORNEYS FOR APPELLEES**

*Oral Argument Requested*

# TABLE OF CONTENTS

Table of Contents ..................................................................................................ii

Index of Authorities ............................................................................................ vi

Statement of the Case ..........................................................................................1

Statement Regarding Oral Argument ..................................................................2

Statement of the Issues Presented........................................................................2

Statement of Facts ...............................................................................................4

    I. Legal Background.........................................................................................4

        A. The Texas Medicaid Fraud Prevention Act....................................................4

        B. The Texas Medicaid orthodontic benefit.........................................................5

    II. Factual Background.....................................................................................6

        A. Relators' 2012 TMFPA actions against Xerox ...............................................6

        B. The State's subsequent investigation of Xerox's TMFPA violations and attempts to settle Relators' claims against Xerox..............................................10

        C. The State's TMFPA action and settlement with Xerox .............................12

    III. Procedural Background .............................................................................14

Summary of the Argument ................................................................................16

Standard of Review ...........................................................................................17

Argument...........................................................................................................18

    I. The State Is Not Immune from Relators' Joint Motion Enforcing Their

Statutory Entitlement to a Share of the Settlement that Resolved Their Claims. 18

A. The State's settlement of Relators' suits against Xerox triggered their statutory entitlement to a share. ...................................................................19

B. The State's severance did not deprive the trial court of jurisdiction. .........20

1. Relators did not sue the State to recover their relator's share ..................20

2. The State has waived its challenge to the severance it obtained in the -581 Action. ......................................................................................................20

3. Relators' Joint Motion states a cause of action .......................................20

4. Relators must be able to vindicate their statutory right to a share of a settlement that resolves their claims. ...........................................................20

II. The Trial Court Did Not Err in Holding That No Public Disclosures Bar Relators ........................................................................................................26

A. The TMFPA's Public Disclosure Bar. ......................................................27

B. No legislative or administrative report, hearing, audit, or investigation disclosed Xerox's fraud before Relators filed their *qui tam* petitions. ..........28

1. The July 5, 2011, letter from the federal government to the State announced its planned audit of the State, not Xerox ....................................20

2. The January 24, 2012, testimony did not contain public disclosures of Relators' allegations or transactions against Xerox. ....................................30

C. No news media put the State on notice of Xerox's fraud before Relators filed suit. ...................................................................................................32

1. The May 13, 2011, WFAA article focused on the State and providers. .....33

2. The June 19, 2011, WFAA broadcast concerned wrongdoing on the part of dentists, orthodontists, and the State, not Xerox. ........................................35

3.The August 25, 2011, WFAA article describes the State's denial of fraud in the Medicaid Orthodontics Program. .........................................................37

4. The August 30, 2011, HHSC news release did not disclose any of Relators' allegations or transactions. .......................................................................38

*5. The September 1, 2011, Columbia Journalism Review article summarized WFAA reporting that blamed providers and the State.* ...................................39

*6. The November 11, 2011, WFAA broadcast describes ACS's activity-based compensation, provider wrongdoing, and again blames the State.* ...............40

*7. The December 16, 2011, WFAA broadcast lays blame on the State, not Xerox.* ........................................................................................................42

*8. The December 27, 2011, WFAA article focuses on the State, not Xerox, and does not describe fraud.* ......................................................................43

*9. The January 25, 2012, Texas Watchdog article is about the State's investigation into orthodontists and denies fraud* ..........................................44

D. Even if there was a public disclosure, LaFountain and Ellis are original sources. ....................................................................................................44

*1. The TMFPA's original source exception favors relators.* ......................46

*2. LaFountain is an original source under §36.113(b)(1)* ........................47

*3. Dr. Ellis is an original source, as the State has repeatedly admitted* .......47

III. Neither LaFountain nor Dr. Ellis Is Barred by the First-to-File Bar. ...........51

A The Third Court of Appeals has already held that the first-to-file bar does not apply to LaFountain and Ellis. .................................................................51

B. The State cannot rely on evidence beyond the TMFPA petitions themselves to establish that they are barred. ..................................................52

C. LaFountain and Ellis are not barred by the first-to-file provision. ............54

IV. The Trial Court Did Not Abuse Its Discretion in Awarding Pre-Judgment Interest ...................................................................................................60

V. Even if the Seven Percent Cap Applied, Relators Should Be Awarded More than a Nominal Amount ...............................................................................63

Conclusion and Prayer ...................................................................................66

Certificate of Compliance .............................................................................68

Certificate of Service.........................................................................................69

Appendix.........................................................................................................70

# INDEX OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Abbott v. G.G.E.*,
    463 S.W.3d 633 (Tex. App.—Austin 2015) .................................................62, 63

*Baylor Univ. v. Sonnichsen*,
    221 S.W.3d 632 (Tex. 2007) ............................................................17

*Bituminous Cas. Corp. v. Vacuum Tanks, Inc.*,
    75 F.3d 1048 (5th Cir. 1996) ..........................................................60

*City of Dallas v. Wright*,
    120 Tex. 190 (1931) ......................................................................62

*City of San Antonio v. Doyle*,
    No. 04-98-00286-CV, 1999 WL 89728 (Tex. App.—San Antonio
    Feb. 24, 1999) ...............................................................................60

*Cooper v. Blue Cross and Blue Shield of Florida, Inc.*,
    19 F.3d 562 (11th Cir. 1994) ...............................................35, 37, 45

*Farmers Group, Inc. v. Geter*,
    620 S.W.3d 702 (Tex. 2021) ...........................................................18

*Glaser v. Would Care Consultants, Inc.*,
    570 F.3d 907 (7th Cir. 2009) ......................................................46, 47

*Gorman v. Countrywood Prop. Owners Ass'n*,
    1 S.W.3d 915 (Tex. App.—Beaumont 1999) ...................................23

*Hollingsworth v. City of Dallas*,
    931 S.W.2d 699 (Tex. App.—Dallas 1996) ......................................25

*Hyde v. Hawk*,
    No. 07-14-00059-CV, 2017 WL 5763069 (Tex. App.—Amarillo
    Nov. 27, 2017) ..............................................................................21

*In re Ament*,
    890 S.W. 2d 39 (Tex. 1994) ...........................................................62

*In re Sanofi-Aventis U.S. LLC*,
711 S.W.3d 732 (Tex. App. [15th Dist.] 2025) ......................................................4

*In re Xerox Corp.*,
555 S.W.3d 518 (Tex. 2018) ..............................................................................4, 61

*Inman v. O'Donnell*,
722 S.W.2d 16 (Tex. App.—Dallas 1986) .........................................................21, 22

*Jaster v. Comet II Const., Inc.*,
438 S.W.3d 556 (Tex. 2014) ................................................................................22

*Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*,
962 S.W.2d 507 (Tex. 1998) ................................................................................60

*Little v. Shell Exploration & Production Co.*,
690 F.3d 282 (5th Cir. 2012) .......................................................29, 30, 35, 51

*Lovell v. AthenaHealth, Inc.*,
56 F.4th 152 (1st Cir. 2022).................................................................................53

*McIntyre v. Castro*,
No. 13-17-00565-CV, 2018 WL 6175858 (Tex. App.—Corpus
Christi–Edinburg Sept. 6, 2018) ........................................................................18

*Morgan v. Ebby Halliday Real Estate, Inc.*,
873 S.W.2d 385 (Tex. App.—Fort Worth 1993)................................................61

*Nazari v. State*,
561 S.W.3d 495 (Tex. 2018) ................................................................................61

*Orca Assets, G.P., L.L.C. v. JP Morgan Chase Bank, N.A.*,
No. 05-22-00292-CV, 2024 WL 1171375 (Tex. App. —Dallas,
Mar. 19, 2024)...............................................................................................21, 22

*Origin Bank v. Castellano*,
No. 4:21-CV-02173, 2024 WL 169664 (S.D. Tex. Jan. 12, 2024) ....................61

*Patriot Contracting, LLC v. Shelter Prods. Inc.*,
650 S.W.3d 627 (Tex. App.—Houston [1st Dist.] 2021).......................18, 61, 62

*Roark v. Stallworth Oil and Gas, Inc.*,
813 S.W.2d 492 (Tex. 1991) ................................................................................31

*Roberts v. Accenture, LLP*,
    707 F.3d 1011 (8th Cir. 2013) ...................................................................18

*Rockwell Intern. Corp. v. United States*,
    549 U.S. 457 (2007)...................................................................................45

*Rowley v. Lake Area Nat. Bank*,
    976 S.W.2d 715 (Tex. App.—Houston [1st Dist.] 1998)...................................18

*Sealy Emergency Room, L.L.C. v. Free Standing Emergency Room*
    *Managers of Am., L.L.C.*,
    685 S.W.3d 816 (Tex. 2024) ......................................................................17

*State Dept. of Highways and Public Transp. v. Bacon*,
    754 S.W.2d 279 (Tex.App.—Texarkana 1988).............................................60, 62

*State v. Ellis*,
    681 S.W.3d 501 (Tex. App.—Austin 2023)...................................................*passim*

*Tittizer v. Union Gas Corp.*,
    171 S.W.3d 857 (Tex. 2005) ....................................................................21, 22

*U.S. ex rel. Merena v. SmithKline Beecham Corp.*,
    205 F.3d 97 (3d Cir. 2000) ........................................................................18

*Union Carbide Corp. v. Synatzske*,
    438 S.W.3d 39 (Tex. 2014)........................................................................62

*United States ex rel. Branch Consultants v. Allstate Ins.*,
    560 F.3d 371 (5th Cir. 2009) .....................................................................55

*United States ex rel. Burke v. St. Jude Med., Inc.*,
    No. CV-16-3611-SAG, 2021 WL 6135202 (D.Md. Dec. 29. 2021)............64, 65

*United States ex rel. Detrick v. Daniel F. Young, Inc.*,
    909 F.Supp. 1010 (E.D. Va. 1995) .............................................................45

*United States ex rel. Harman v. Trinity Industries, Inc.*,
    2014 WL 47258 (E.D. Tex. 2014)............................................................46, 48

*United States ex rel. Health v. AT&T, Inc.*,
    791 F.3d 112 (D.C. Cir. 2015)....................................................................*passim*

*United States ex rel. LaCorte v. Wagner*,
     185 F.3d 188 (4th Cir. 1999) ..................................................................24

*United States ex rel. Lisitza v. Par Pharmaceutical Companies, Inc.*,
     2017 WL 3531678 (N.D. Ill. 2017) .......................................................45

*United States ex rel. McGuire v. Millenium Labs, Inc.*,
     923 F.3d 240 (1st Cir. 2019)....................................................................54

*United States ex rel. Reagan v. East Tex. Med. Ctr. Regional
     Healthcare System*,
     384 F.3d 168 (5th Cir. 2004) .............................................................46, 48

*United States v. AthenaHealth, Inc.*,
     No. CV 17-12125-NMG, 2022 WL 658654 (D. Mass. Mar. 3,
     2022) ........................................................................................................53

*United States v. L-3 Communications EOTech, Inc.*,
     921 F.3d 11 (2d Cir. 2019) ................................................................24, 25

*United States v. Planned Parenthood of Houston*,
     570 F. App'x 386 (5th Cir. 2014) ............................................................52

*United States v. Wegeler*,
     941 F.3d 665 (3d Cir. 2019) ....................................................................24

**Statutes**

31 U.S.C. §3730(b)(5)..................................................................................24

False Claims Act, 31 U.S.C. §§3729 *et seq.* .......................................*passim*

Tex. Bus. & Com. Code §17.50(d)................................................................24

Tex. Gov't Code §311.016(4) (App.2) .....................................................19, 22

Tex. Gov't Code §311.021(2)........................................................................25

Tex. Hum. Res. Code §36.001 *et seq.* (App.1).....................................*passim*

Tex. Hum. Res. Code. §36.002(1) ................................................................13

Tex. Hum. Res. Code §36.109(a) ....................................................2, 15, 19, 22

Tex. Hum. Res. Code §36.110(a) ...................................................1, 2, 22, 25

Tex. Hum. Res. Code §36.113(b) ..................................................................45

Tex. Prop. Code §5.006 ........................................................................23, 24

Texas Health Care Program Fraud Prevention Act ....................................4

Texas Property Code Chapter 53 ..............................................................62

Texas Tort Claims Act ..............................................................................60

**Other Authorities**

25 Tex. Admin. Code §33.71(a) ..................................................................6

26 Tex. Admin. Code §256.71(a) ................................................................6

Texas Rule of Appellate Procedure 9.4(i)(1).............................................68

Texas Rule of Appellate Procedure 9.4(e).................................................68

Texas Rule of Civil Procedure 41 .............................................................21

# STATEMENT OF THE CASE

*Nature of the Case*: This is an appeal from orders granting Relators' motions for a relator's share as provided by the Texas Medicaid Fraud Prevention Act ("TMFPA"), Tex. Hum. Res. Code §§36.109, 36.110 (App.1), [1] denying the State's motion for summary judgment, and denying in part the State's motion to modify the judgment.

*Trial Court*: The 459th Judicial District Court of Travis County, the Honorable Maya Guerra Gamble presiding.

*Trial Court Proceeding*: Relators moved the trial court for a determination of their statutory entitlement to a relator's share of the settlement that resolved their claims as provided by the TMFPA. CR.1, CR.3348. On remand following an appeal of the denial of the State's plea to the jurisdiction, *State v. Ellis*, 681 S.W.3d 501 (Tex. App.—Austin 2023, no pet.), the State filed a motion for summary judgment. CR.6149. After briefing and argument, the trial court granted Relators' motion and denied the State's. CR.9171-72. Relators filed a motion for prejudgment interest and entry of judgment, CR.9173, which the trial court granted. CR.9486. The State moved to modify the final judgment, CR.9487, which the trial court granted in part and denied in part. CR.9533.

*Trial Court Disposition*: The Amended Final Judgment awarded Relators a 17.5% statutory share pursuant to Tex. Hum. Res. Code §36.110(a). It assessed prejudgment interest on the award at the rate of 5%, and postjudgment interest at the rate of 7.75%. CR.9534.

---

[1] Citations to the clerk's record are formatted "CR.[page no.]". Citations to the reporter's record are formatted "RR.[volume.page no.:line no.]". Citations to Appellees' Appendix are formatted "App.[Tab No]." Citations to the Appellant's brief are formatted "Br. at [page no.]."

1

**STATEMENT REGARDING ORAL ARGUMENT**

The State's arguments, if accepted, would neuter the TMFPA and frustrate the incentives built into it, reading the relator's entitlement to a statutory share out of the statute and vesting the State, not the court, with sole discretion to decide whether and in what amount a share should be awarded. The significance of these issues warrants oral argument.

**STATEMENT OF THE ISSUES PRESENTED**

The issues presented are:

1.  Did the State's severance of Relators' Joint Motion deprive the trial court of jurisdiction to determine their statutory entitlement to a Relator's share under TMFPA §§ 36.109(a) and 36.110(a) where

    a.  The State sought and obtained the severance of the Joint Motion from the State's TMFPA action; and

    b.  The State failed to object to the severance?

2.  Did the trial court err in finding that there were no public disclosures prior to Relators' *qui tam* suits where

    a.  The State previously argued in related litigation that the alleged disclosures did not publicly disclose fraud;

    b.  The State announced that its investigation into Xerox's TMFPA violations began in June, 2012, after Relators filed their *qui tam*

suits; and

      c. Even if there were public disclosures, the State repeatedly endorsed Dr. Ellis as an original source?

3.      Did the trial court err in denying summary judgment on the first-to-file bar?

4.      Did the trial court abuse its discretion in awarding prejudgment interest on equitable grounds?

5.      If the trial court erred in finding there were no public disclosures, should the Court remand to the trial court for re-determination of Relators' statutory award under §36.110(b)?

I.    **Legal Background**

A.    **The Texas Medicaid Fraud Prevention Act**

The Texas Medicaid Fraud Prevention Act ("TMFPA"),[1] Tex. Hum. Res. Code §§36.001 *et seq.* (App.1), authorizes the attorney general, as well as private citizens via *qui tam* provisions, to pursue fraud against the Texas Medicaid program. *In re Xerox Corp.*, 555 S.W.3d 518, 525 (Tex. 2018); *In re Sanofi-Aventis U.S. LLC,* 711 S.W.3d 732, 736 (Tex. App. [15th Dist.] 2025); Tex. Hum. Res. Code §§36.051-36.055 ("Actions by the Attorney General), §§36.101-36.117 ("Actions by Private Persons"). These private persons ("relators") initiate their *qui tam* actions under seal, *id.* at §36.102(b), and the State may intervene to take over the action or decline to do so. *Id.* at §§36.102(c), 36.104. The State may also elect to pursue its claim "through any alternate remedy available" to it, and the relator "has the same rights in the other proceeding" as he would have had if the State litigated his claim within his *qui tam* action. *Id.* at §36.109(a).

The TMFPA, like its federal counterpart, the False Claims Act ("FCA"), 31 U.S.C. §§3729 *et seq.*, incentivizes relators to file suit by granting them a share of the proceeds of the action, including any alternate remedy. Tex. Hum. Res. Code §§36.109, 36.110. Where the State intervenes, the relator is "entitled" to

---

[1] As of September 2023, the TMFPA is now called the "Texas Health Care Program Fraud Prevention Act." The 2011 version of the TMFPA applies here.

receive between 15 and 25 percent of the proceeds of the action; where it declines to intervene, the relator is "entitled" to between 25 and 30 percent. *Id.* at §§36.110(a), (a-1). "Proceeds of the action" include "proceeds of a settlement of the action." *Id.* at §36.110(d).

Where the trial court determines that the *qui tam* action is based on public disclosures of the allegations or transactions in certain fora, and the relator is not an "original source" of the information, the action may be barred, though the State may oppose the dismissal. *Id.* at §36.113(b). If the trial court determines that the *qui tam* action "is based primarily on disclosures of specific information, other than information provided by the person bringing the action," it may award a lesser amount up to seven percent, and must "consider the significance of the information and the role of the person bringing the action in advancing the case to litigation." *Id.* at §36.110(b). Finally, a relator may not intervene in or "bring a related action based on the facts underlying a pending action brought under [the *qui tam* provisions]." *Id.* at §36.106. This "first-to-file bar" applies if a later complaint "alleges the same material or essential elements of fraud described in a pending *qui tam* action[.]" *State v. Ellis*, 681 S.W.3d 501, 505 (Tex. App.—Austin 2023, no pet.) (quotation and citations omitted).

### B.    The Texas Medicaid orthodontic benefit

As relevant to the TMFPA suits against Xerox Corporation and its

affiliates (collectively, "Xerox" or "ACS"), the Texas Medicaid program's limited orthodontic benefit excludes cosmetic orthodontics from coverage. 25 Tex. Admin. Code §33.71(a) (current version at 26 Tex. Admin. Code §256.71(a)). Covered orthodontic services are "limited to treatment of severe handicapping malocclusion and other related conditions," and "must be prior authorized." *Id.* The Texas Medicaid Provider Procedures Manual further limited the orthodontic benefit, covering only services for (1) children ages 12 and 20 with permanent teeth and a severe handicapping malocclusion (defined by a score of 26 points or higher on an "HLD scoresheet"); (2) children up to age 20 with a cleft palate; or (3) other medically-necessary conditions.

## II. Factual Background

### A. Relators' 2012 TMFPA actions against Xerox

Relator Alvarez filed her *qui tam* petition on February 28, 2012. CR.6222. She alleged that Xerox approved orthodontic treatment for braces that did not credibly meet the 26-point threshold on the HLD scoresheet, and for children under 12 who still had baby teeth. *Id.* at ¶¶6, 27, 29, 51, 52. She based her allegations on her personal discovery of more than 100 instances of orthodontics claims that Xerox improperly preapproved and paid. CR.7030-32 (88:17-90:16); CR.6993 (51:1-21); CR.7068-69 (126:9-127:4); CR.6995-96 (53:15-54:2); CR.7028-29 (86:21-87:4); CR.7073 (95:8-21); CR.6222-28 ¶¶2, 7-10, 23. In

February 2012 she informed her supervisor that her employer billed Medicaid for a patient who did not qualify, and that the claim should be reimbursed because Xerox should never have approved the treatment in the first place. CR.6985 (43:21-24). She was demoted as a result, and eventually resigned. CR.6986 (44:16-25).

Relator LaFountain filed his petition on March 19, 2012, alleging that Xerox failed to determine whether claims submitted for dental services complied with Medicaid's reimbursement guidelines, CR.6317 ¶¶6, 37, 45, and that Xerox used an "activity based compensation" program that paid people based on the number of claims they processed, disincentivizing the prevention of fraud. *Id.* at ¶¶58, 60. He learned of the foregoing working for his former employer, a large Medicaid dental chain that expanded into orthodontics in 2011 based on its understanding that Xerox would preapprove Medicaid orthodontics even if they did not qualify for coverage. CR.7242-44 (75:16-77:4); CR.7692-93 ¶¶3-8. He reported his allegations directly to State investigators in Dallas in the years before filing suit, including specifically "that multiple claims for general dentistry were being approved for payment by ACS and should not have been" and "that ACS was approving ortho claims for payment (for braces, et cetera) without Bear Creek even submitting models to them which violated Medicaid guidelines for reimbursement." CR.7239-40 (72:19-73:5); CR.7243-44 (76:18-77:21);

7

CR.7693 ¶9.

Dr. Ellis filed suit on April 24, 2012. CR.6423. She alleged that Xerox "failed to provide proper staffing or adequately-trained staff, or both" to review prior authorization requests, and used unqualified employees to provide pre-authorization, *id.* at ¶¶4.20, 4.23, 11.01, 11.02; that Xerox violated §36.002(1) because it "knowingly made or caused to be made a false statement or misrepresentation of a material fact to permit it to receive a benefit or payment under the Medicaid program and "knowingly concealed material facts," *id.* at ¶11.02; and that Xerox violated §36.002(2) because it "knowingly concealed or failed to disclose information that permitted it to receive Medicaid payments that were not authorized or that were greater than the authorized payments" and "conceal[ed] from the government information about its failure to perform its duties. . . and to adjudicate preapproval claims submitted by providers," *id.* at ¶11.03.

Dr. Ellis based her allegations on her work as a board-certified orthodontist and clinical assistant professor in the Division of Oral Surgery at the UT Southwestern Medical Center. *Id.* at ¶4.01; CR.3510 ¶3; CR.7404 (35:7-23). She started treating Medicaid patients in 1999, and in 2003 she began observing the patient outcomes resulting from Xerox authorizing unnecessary, substandard, and harmful treatment. CR.3510 ¶4; CR.7504 (135:14-18). She observed that

8

Xerox was approving orthodontic devices that were not necessary or covered, CR.7408-09 (39:7-40:3), CR.7411-12 (42:11-43:8), and that it was fraudulently approving whole cases for orthodontic treatment that did not qualify. CR.7414 (45:13-16), CR.7427 (58:19-25), CR.7437-38 (68:10-69:12).

She began reporting the foregoing in 2008, first to trade associations and then to federal officeholders and their staff. CR.3510-13 ¶¶5, 21. After Byron Harris's first report for WFAA in May 2011 she offered to speak with him, and from their first conversation onwards, she became an on-camera and background source for him, providing both factual information and expert analysis. CR.3511 ¶7; CR.7455-57 (86:24-88:8). She also suggested that he investigate Xerox's role. CR.7699.

As a result of one of her appearances on WFAA, HHSC-OIG retained Dr. Ellis as a contractor to review patient files from individual orthodontic providers who were suspected of Medicaid fraud, CR.3512 ¶¶8-11; CR.7459-61 (90:3-92:21), and to "identify billing exceptions and quality of care concerns" on the part of the providers, not Xerox. CR.8647-48. She asked her supervisor why HHSC-OIG was not pursuing Xerox for wrongfully approving the treatment, and was told not to inquire about that. CR.7495-96 (126:3-127:6); CR.7500-03 (131:10-134:17); CR.6495 ¶4.07. On January 3, 2012, she reported her concerns about Xerox, as well as OIG's instruction that she stop raising them, to an

assistant to State Senator Jane Nelson and policy analyst for the Senate Committee on Health and Human Services. CR.6726-29 ¶9. She made subsequent reports concerning Xerox's fraud to the same legislative assistant before finally resorting to filing her *qui tam* action. CR.6660-661.

In addition to stating claims against Xerox for its TMFPA violations, each of Relators' petitions included claims for a statutory share of any recovery by the State. CR.6240 ¶46, CR.6242-43 ¶¶58, (g) (Alvarez); CR.6337 ¶¶51-52, CR.6341 at (h); (LaFountain); CR.6544 ¶21.01 (Ellis).

### B. The State's subsequent investigation of Xerox's TMFPA violations and attempts to settle Relators' claims against Xerox

The State began its investigation into Xerox "[i]n June of 2012[,]" months after each Relator filed suit. CR.211. As the State acknowledged in its 2019 settlement agreement with Xerox that resolved the State and Relators' claims (the "Xerox Settlement"), "[o]n or about June 8, 2012, the State of Texas initiated an investigation" into Xerox. CR.27 at I.D.

The State intervened in each Relator's case, RR.Vol.3.51:12-14. After intervening in Dr. Ellis's action on June 25, 2012, CR.3221, CR.3367-68,[2] the

---

[2] Contrary to the assertion in its opening brief, the State's intervention into Ellis's *qui tam* was not "with respect to the orthodontists and dental groups, but not with respect to Xerox." Br. at 8 (citing CR.3845, a portion of the State's motion for summary judgment that does not concern intervention). The notice the State filed stated, without limitation, that it elected "to intervene and proceed with the pending *qui tam* action." CR.3221; *accord* CR.3368 ("ADMIT that the Texas Attorney General's Office intervened in case No. D-1-GV-12-000435 on or around June

State repeatedly asserted, in litigation that spun off from her original petition, that doing so meant that it endorsed her as "a bona fide relator." CR.150 at 50:3-7 ("When the State of Texas intervened in the under seal *qui tam* . . . we endorsed this Relator and we said this is a bona fide Relator"); CR.173 (same); CR.3129.

Starting in July 2012 and continuing through February 2014, Dr. Ellis and her counsel met and corresponded with the State to encourage it to focus on Xerox. CR.8753; CR.8785-87; CR.8823; CR.8842. She provided an hours-long training session to attorneys from the Civil Medicaid Fraud Division in February, 2014 to assist them in their investigation of her allegations. CR.3519-20.

In January 2013 the State requested and received a partial lift of the seal in Ellis's case to inform Xerox of her allegations against it. CR.3047-48. In September 2013 the State obtained an order partially unsealing Alvarez's suit as to Xerox, CR.6762, and by January 2014 the State represented that it and Xerox were in settlement discussions to resolve her suit. CR.6759. In February 2014 the State asked Alvarez to nonsuit her case, assuring her that doing so would not extinguish her rights. CR.55. In June, 2014, the State obtained an order unsealing Ellis's suit against Xerox and abating it. CR.7730.

During this time the State successfully defended Ellis against claims by an orthodontic provider named in her *qui tam* petition that public reporting pre-

25, 2012.").

11

dating her suit—the same suit and reporting at issue here—disclosed her allegations, and that she was not an original source. CR.8034-58, CR.8293-8331. The State argued that "the TMFPA seems to favor allowing even cases with significant public disclosures to go forward," CR.8313, and that even if there were public disclosures, Ellis was an original source, since her knowledge was direct and independent of any public disclosures, she voluntarily reported the fraud before filing suit, and her contract work for HHSC did not bar her under the TMFPA. CR.8320-33. The State later agreed to pay Ellis and a later-filed relator a 17.5% statutory share of the judgment against this provider. CR.3502-03.

### C. The State's TMFPA action and settlement with Xerox

Two years after Relators filed their suits and the State initiated its investigation, the State filed its TMFPA petition on May 9, 2014, in cause number D-1-GV-14-000581 (the "-581 Action"). CR.6732. It alleged that Xerox approved prior authorization requests without meaningfully verifying that they scored 26 or more, CR.6738 ¶17 (as first alleged by Alvarez); Xerox approved claims for children under 12 without verifying that they no longer had baby teeth, CR.6739 ¶18 (as first alleged by Alvarez); and Xerox used activity-based compensation, CR.6739-40 ¶21 (as first alleged by LaFountain). It also alleged that Xerox used inadequately trained, unqualified staff, CR.6738-50 ¶¶17, 27, 33,

39, made false statements and misrepresented material facts to HHSC in violation of TMFPA ¶36.002(1), CR.6750 ¶39, and concealed information regarding its application and enforcement of Medicaid policy regarding orthodontic treatment in violation of ¶36.002(2), CR.6751 ¶41, allegations first made by Ellis. Four of the six assistant attorneys general at Ellis's February 2014 training were listed as counsel of record in the -581 Action. CR.3519 ¶4; CR.6757.

In both June and September 2014 the State used Dr. Ellis's *qui tam* suit as a shield against would-be intervenors in its -581 Action, arguing that because its case was based on facts underlying Ellis's pending *qui tam* suit, the providers were prohibited from intervening in the -581 Action. CR.7717; CR.7910.

On February 19, 2019, the State and Xerox reached an agreement settling the State's -581 Action and each of the *qui tam* actions. CR.26-49 I.F., II.E., III.B., III.H.; *Ellis*, 681 S.W.3d at 513-514 n.9 ("the settlement agreement between the State and Xerox expressly settled appellees' *qui tam* suits and allocated a portion of the proceeds toward payment of attorney's fees, expenses, and costs that the State incurred in appellees' *qui tam* actions."). That same month, the State agreed to pay a $2.25 million relator's share to a relator who filed a 2016 *qui tam* action naming Xerox's subcontractor; the only stated reason for the payment was that his claims (like Relators') were resolved by the Xerox Settlement. CR.3496-3500.

13

## III. Procedural Background

Relators filed their joint motion for a relator's share ("Joint Motion") on February 20, 2019. CR.8. The State sought to sever Relators' Joint Motion so that it could dismiss its -581 Action and issue Xerox the agreed releases, CR.3616-25, and argued that the Relators' claims "are similar to a claim for attorney fees" and "could each have been independently asserted as an independent action." CR.3622; *id.* at n.4. The State reserved its rights to challenge the merits of Relators' claims, CR.3618, while also representing that the severance "should not, in any way, prejudice the Relators . . . or release [] any legal rights." CR.3617. The court granted the motion and severed Relators' Joint Motion into a separate cause number. CR.3637-38.

The State filed its plea to the jurisdiction challenging Relators' Joint Motion in the new cause number on December 22, 2021, asserting that while the TMFPA allows "certain relators to sue the State for a share of the State's TMFPA recovery," sovereign immunity deprived the court of jurisdiction over LaFountain and Ellis's claims because the severed cause was a "suit" against the State and barred by the first-to-file provision of the TMFPA. CR.2575-2591; *see also* CR.2608 ("only the relator who files the first among "related" *qui tam* actions . . . may sue the State for a relator share award."), CR.3303 ("the State does <u>not</u> argue that its sovereign immunity shields it completely from an

adjudication of the merits . . . the State argues that adjudication should be limited to Alvarez" as first-to-file) (emphasis in original). The trial court denied the State's plea. RR.Vol.3.87:12-88:15. On interlocutory appeal, the Third Court of Appeals affirmed, holding that the -581 Action was an "alternate remedy" to Relators' *qui tam* actions under TMPFA §36.109(a), the Xerox settlement settled their claims, and the first-to-file bar did not apply to LaFountain and Ellis. *Ellis*, 681 S.W.3d at 512-16.

Relators filed a renewed motion for determination of their entitlement to a statutory relator's share on June 4, 2024, requesting a 17.5% award based on the State agreeing to pay that same amount to Ellis in a related matter. CR.3348 at 3355-58; CR.3502-03. In response, the State filed special exceptions asserting that Relators could not state a "valid, independent cause of action" against it following the severance. CR.3527-36. After briefing and argument, the court denied the special exceptions. CR.3752. The State moved for summary judgment, and after further briefing and argument, the court denied the motion, granted Relators', and determined that Relators were entitled to a 17.5% share of the Xerox settlement proceeds. CR.9172.

Relators moved for an equitable award of prejudgment interest on the basis of the State's gamesmanship and delay, including its conduct in severing Relators' Joint Motion only to later assert that it was a "suit" barred by sovereign

immunity, its refusal to cooperate in discovery, and its special exceptions that contradicted the grounds upon which it obtained the severance. CR.9173-85. The court granted the motion, issuing a final judgment. CR.9486. The State sought to modify the judgment, CR.9487, which the court partially granted. CR.9534. This appeal followed.

## SUMMARY OF THE ARGUMENT

The TMFPA codifies a strong public policy of encouraging whistleblowers to bring the State allegations of fraud, by entitling them to a share of a recovery stemming from their action. But here, the State argues that even though it intervened in and settled their cases, Relators cannot invoke the statutory provisions that grant them a right to share in the recovery because the TMFPA does not contain a standalone cause of action for a relator's share. The State not only reads out whole sections of the statute, but also would gut the incentive structure built into the TMFPA that encourages whistleblowers to come forward and allows the State to pursue their allegations of fraud on the taxpayers. The State waived this argument and it is barred by the invited-error doctrine. In any event, it is wrong as a matter of both law and policy.

The State also argues that the trial court erred in denying summary judgment on first-to-file and public disclosure grounds. The Third Court of Appeals, however, already considered and rejected the State's first-to-file

16

arguments, and in any event, Alvarez's petition does not bar LaFountain or Ellis, since they do not all allege the same elements of fraud.

With respect to the alleged public disclosures, the State's arguments are counterfactual and belied by the very evidence it cites. They are also contradicted by the State's prior admissions concerning its investigation into Xerox, as well as its arguments in defense of Dr. Ellis in related suits that originated from her *qui tam* petition. The trial court did not err in concluding that, as the State argued in the years before it settled with Xerox, there were no public disclosures. Even if there were, Relators are original sources; even if they were not, the amount of an award within the applicable statutory range is within the trial court's discretion, and the facts here justify more than a nominal amount.

Finally, the State's argument that interest can only be awarded on equitable grounds when no statute controls is wrong, and the trial court did not abuse its discretion in awarding it here.

## STANDARD OF REVIEW

A trial court's ruling on special exceptions is reviewed for abuse of discretion. *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635-36 (Tex. 2007). An order granting a severance is reviewed for abuse of discretion. *Sealy Emergency Room, L.L.C. v. Free Standing Emergency Room Managers of Am., L.L.C.,* 685 S.W.3d 816, 822 (Tex. 2024). Likewise, an award of prejudgment interest is

reviewed for abuse of discretion. *Patriot Contracting, LLC v. Shelter Prods. Inc.*, 650 S.W.3d 627, 659 (Tex. App.—Houston [1st Dist.] 2021, pet. denied)). A ruling on summary judgment is reviewed *de novo*. *Farmers Group, Inc. v. Geter*, 620 S.W.3d 702, 708 (Tex. 2021).

Relators are not aware of any Texas case that has addressed the standard of review for challenges to the amount of a relator's share under the TMFPA. Under the federal FCA, these awards are reviewed for clear error. *E.g., Roberts v. Accenture, LLP,* 707 F.3d 1011, 1015-17 (8th Cir. 2013); *U.S. ex rel. Merena v. SmithKline Beecham Corp.*, 205 F.3d 97, 107 (3d Cir. 2000). In the comparable context of attorney's fees, Texas courts review an award under an abuse of discretion standard. *Rowley v. Lake Area Nat. Bank*, 976 S.W.2d 715, 724 (Tex. App.—Houston [1st Dist.] 1998, pet. denied); *see also McIntyre v. Castro*, No. 13-17-00565-CV, 2018 WL 6175858, *6 (Tex. App.—Corpus Christi–Edinburg Sept. 6, 2018, pet. denied).

## ARGUMENT

### I. The State Is Not Immune from Relators' Joint Motion Enforcing Their Statutory Entitlement to a Share of the Settlement that Resolved Their Claims.

The State repackages its earlier attempts to assert sovereign immunity in two ways. First, it argues Relators have no cause of action entitling them to "sue the State" to claim their statutory share. Br. at 11-12. Second, it claims that

sovereign immunity deprives the courts of jurisdiction to determine relators' entitlement to a statutory share because the TMFPA's alternative-remedy provision does not authorize a "standalone action" for a relator's share. *Id.* at 12-15. But the Relators did not sue the State; they sued Xerox as provided by the TMFPA. When the State opted to pursue and settle their claims in an alternate proceeding, that triggered their rights to share in the recovery. None of the State's maneuvers can obscure that basic fact. The trial court recognized as much, as did the Third Court of Appeals. This Court should as well.

**A.      The State's settlement of Relators' suits against Xerox triggered their statutory entitlement to a share.**

As the State acknowledges, Br. at 12, the TMPFA expressly authorizes relators to bring actions in the name of both the relator and the State. Regardless of whether the State pursues and settles a relator's claims in the *qui tam* action or in an alternate remedy, the statute "entitle[s]" him to a share of the proceeds, and mandates that the trial court determine the appropriate percentage within the specified award range depending on whether the State intervened and, if so, the extent to which the relator contributed to the case. Tex. Hum. Res. Code §§36.109(a); 36.110(a); 36.110(a-1); Tex. Gov't Code §311.016(4) (App.2) ("'Is entitled to' creates or recognizes a right.").

Despite the State's repeated claims to the contrary, Relators have never sued the State; instead, they initiated *qui tam* actions against Xerox. Because the

State intervened in those actions, pursued their claims against Xerox in an alternate proceeding, and then settled their claims in the alternate proceeding, the TMFPA expressly entitles them to a share of the proceeds. *Ellis*, 681 S.W.3d at 512.

### B. The State's severance did not deprive the trial court of jurisdiction.

The State seeks to avoid the statutorily-mandated result above by arguing that because it obtained a severance of the Joint Motion from the -581 Action, the severance transformed Relators' motion into a "suit against the state," which is not authorized by the TMFPA. Br. at 11-12. This argument fails for at least four reasons.

### 1. Relators did not sue the State to recover their relator's share.

As the Third Court of Appeals explained in affirming the trial court's denial of the State's plea to the jurisdiction, Relators' severed Joint Motion was not a "suit" against the State. *Ellis,* 681 S.W.3d at 511-12. Instead, it was a motion "based on their *qui tam* actions against Xerox. . . asserted against Xerox on behalf of—not against—the state." *Id.* at 512.; *see also id.* at n.8 ("We also do not believe that appellees' motion—filed within the State's suit against Xerox following the settlement—falls within the meaning of a "suit" at all.").

Because the TMFPA grants Relators the right to a share of the settlement, "sovereign immunity did not apply to deprive the trial court of jurisdiction to

adjudicate the merits of appellees' joint motion seeking a relator share of the Xerox settlement proceeds." *Id.* at 513.

2. *The State has waived its challenge to the severance it obtained in the -581 Action.*

The State requested the severance and did not object to it, so it cannot argue that the severance was improper. Texas Rule of Civil Procedure 41 provides that "Any claim against a party may be severed and proceeded with separately." "A severance, even though erroneous, is effective and, in the absence of objection, permits valid, final judgments to be rendered in both proceedings." *Inman v. O'Donnell,* 722 S.W.2d 16, 18 (Tex. App.—Dallas 1986, no writ.). And pursuant to the invited error doctrine, "a party cannot complain on appeal that the trial court took a specific action that the complaining party requested[.]" *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 862 (Tex. 2005).

In the attorneys' fees context, Texas courts hold that failure to object waives a complaint regarding a severed attorneys' fees claim. *Hyde v. Hawk,* No. 07-14-00059-CV, 2017 WL 5763069, *1 (Tex. App.—Amarillo Nov. 27, 2017, no pet.) (mem. op.). Likewise, where a party agrees to the severance it later complains of, its claim is waived, and the invited error doctrine will bar the party "from complaining on appeal of any error in the severance." *Orca Assets, G.P., L.L.C. v. JP Morgan Chase Bank, N.A.*, No. 05-22-00292-CV, 2024 WL 1171375, *4 (Tex. App. —Dallas, Mar. 19, 2024, pet. denied).

21

Here, the State requested and received the severance of Relators' Joint Motion from the -581 Action. CR.3616, CR.3637, RR.Vol.3.88:4-8. Only years later did it seek to challenge the effect of the severance, first in its special exceptions, which the trial court overruled, and now on appeal. Because the State sought the severance to which it later took exception, the trial court's ruling on the special exceptions was not an abuse of discretion, and should not be disturbed. *Inman,* 722 S.W.2d at 18. Further, because the State requested the severance it complains of now, the invited error doctrine bars its complaint. *Tittizer,* 171 S.W.3d at 862; *Orca Assets,* 2024 WL 1171375, at *4.

### 3. *Relators' Joint Motion states a cause of action.*

Even if the State were correct, and Relators' Joint Motion became a suit once the State obtained the severance, and even if it was not barred from claiming error in the severance, Relators state a cause of action.

A "cause of action" is "a legal right that a party asserts in the suit that constitutes the action." *Jaster v. Comet II Const., Inc.*, 438 S.W.3d 556, 564 (Tex. 2014) (plurality op.). The TMFPA creates such a right by providing that relators are "entitled" to a share of the proceeds of their action. Tex. Hum. Res. Code §36.110(a); Tex. Gov't Code §311.016(4). Where, as here, relators file claims that the State later pursues and settles via an alternate remedy, the TMFPA gives them the right to a share. *Ellis,* 681 S.W.3d at 512 ("In Sections 36.109(a) and

36.110(a) of the TMFPA, the Legislature expressly contemplated and authorized a relator to receive proceeds from a settlement" that settled their allegations). Indeed, when the State sought and obtained the severance of Relators' Joint Motion, it did so by asserting—in diametric opposition to its special exceptions and arguments on appeal—that Relators' claims "*would be the proper subject of an action if independently asserted*[.]" CR.3622 (emphasis added); *see also* CR.3608 (table comparing the State's assertions in the special exceptions to those in its motion to sever); *accord* CR.2585, CR.2608, CR.3303, RR.Vol.3.32:5-12, 39:22-40:5 (asserting in argument on the State's plea to the jurisdiction that some relators may sue the State to seek a relator's share).

Specifically, the State argued that the Joint Motion was akin to a motion for attorneys' fees, "in that both focus on a payment that is separate and apart from the underlying dispute between the parties in a lawsuit." CR.3713 n.4. As the State noted then, "claims for attorney fees in various types of lawsuits are severable" under Texas law. *Id*. (collecting cases). Under similar statutory schemes authorizing attorneys' fees to prevailing parties who succeed in their primary cause of action, claims for fees are severable. *See, e.g.,* Tex. Prop. Code §5.006 (prevailing parties in an action based on breach of restrictive covenant shall recover attorney's fees), *Gorman v. Countrywood Prop. Owners Ass'n*, 1 S.W.3d 915, 917 (Tex. App.—Beaumont 1999, pet. denied) (appeal of severed

Tex. Prop. Code §5.006 attorney fee claim); Tex. Bus. & Com. Code §17.50(d) (prevailing consumers in DTPA actions shall be awarded attorneys' fees), *Elliott*, 118 S.W.3d at 59 (severing claim for attorneys' fees under the DTPA).

The FCA cases the State relies on now are unavailing. *United States ex rel. LaCorte v. Wagner*, 185 F.3d 188 (4th Cir. 1999) concerned relators who sought to intervene in a later-filed action in violation of 31 U.S.C. §3730(b)(5), the FCA's prohibition on relators' intervention in other *qui tam* actions. Here, Relators filed their Joint Motion in the TMFPA action brought by the State, not another relator, so the TMFPA's analogous prohibition on *qui tam* interventions, §36.106, does not apply. *United States v. Wegeler*, 941 F.3d 665 (3d Cir. 2019) is also inapposite, since it concerned a relator's attempted intervention in a criminal case, not a civil FCA case. The court held that she lacked standing to do so. *Id.* at 676-77.

Finally, *United States v. L-3 Communications EOTech, Inc.*, 921 F.3d 11 (2d Cir. 2019), involved a relator who voluntarily dismissed his suit "long prior" to the government initiating its own. *Id.* at 13. The court held that 31 U.S.C. §3730(b)(5) entitles a relator to share in "the recovery gained by the government in a proceeding it has pursued as an alternative to the *qui tam* action, if"—as here—it "was pending when the government was choosing what course to

pursue." *Id.* at 29.[3] Because that relator dismissed his suit long before the government's suit, the alternate remedy provision did not entitle him to claim an award. *Id.*

### 4. *Relators must be able to vindicate their statutory right to a share of a settlement that resolves their claims.*

Under Texas law, "[i]n enacting a statute, it is presumed that . . . the entire statute is intended to be effective" and "a just and reasonable result is intended[.]" Tex. Gov't Code §311.021(2). Courts "construe legislation in a manner avoiding conflicts and giving each provision effect . . . try to ascertain the legislature's intention as expressed in the language used[, and] consider the entire act, its nature and object, and the consequences following each construction." *Hollingsworth v. City of Dallas*, 931 S.W.2d 699, 702 (Tex. App.—Dallas 1996, writ denied).

The State's reading of the TMFPA ignores both its mandate that relators be awarded a share of the proceeds of their actions, and the necessary implication that courts can determine their entitlement to, and the amount of, the statutory award. Tex. Hum. Res. Code §36.110(a). This would not only frustrate the clear

---

[3] The court noted the relator's concern that this interpretation would "allow the government unfairly to intervene in *qui tam* actions, have those actions dismissed, and then bring its own action, thereby depriving the *qui tam* relators of any right to share in the proceeds gained by the government," but found that there were procedural safeguards in place to prevent that from happening, and that the record before it did not present the unfairness hypothesized by the relator or settlement and dismissal over his objections. *Id.*

25

legislative intent behind the TMFPA's *qui tam* provisions, but in reading relators' entitlement to a share out of the statute, it also leaves to the State's discretion alone whether and in what amount to pay an award. Because the only discretion provided for in the TMFPA's relator's share provision lies with the trial court in its determination of the appropriate percentage to award a relator, the State's argument must fail.

## II. The Trial Court Did Not Err in Holding That No Public Disclosures Bar Relators

The State did not carry its burden to establish that any public disclosures bar Relators. The record establishes instead that, by its own admissions, Texas only began investigating Xerox's TMFPA violations in June 2012, after Relators filed suit, and that it was this investigation—not any earlier alleged public disclosures—that led to "the discovery that Xerox had not been properly reviewing orthodontic claims as required by its contract with the State. . . [and] systematically approved orthodontic claims that were not authorized by state law." CR.211; *see also* CR.27 at I.D.

The record also establishes that in the years leading up to the Xerox settlement, the State argued to the court that *there were no public disclosures*, and that even if there were, Ellis was an original source. CR.8314-29. The State only took the position it advances on appeal *after* Relators sought to claim their statutory entitlement to a share. But for all of the reasons set out below—in

addition to the reasons the State advanced in 2013 and 2016—the public disclosure bar does not bar Relators.

## A.    The TMFPA's Public Disclosure Bar

Because there is no Texas caselaw applying the relevant portions of TMFPA's public disclosure bar, federal cases are instructive. "A prior, public disclosure of fraud occurs 'when the essential elements exposing the particular transaction as fraudulent find their way into the public domain.'" United States ex rel. Poteet v. Bahler Medical, Inc., 619 F.3d 104, 110 (1st Cir. 2010) (quotation and citation omitted). "To be a disclosure 'of fraud' the disclosure must contain either a (1) direct allegation of fraud . . . or (2) both a misrepresented state of facts and a true state of facts so that the listener or reader may infer fraud." Poteet, 619 F.3d at 110 (citations omitted). Some courts formulate this as "X+Y=Z," where "Z represents the allegation of fraud and X and Y represent its essential elements. In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed." United States ex rel. Springfield Terminal Ry. Co. v. Quinn, 14 F.3d 645, 654 (D.C. Cir. 1994) (emphasis in original). "The presence of one or the other in the public domain but not both, cannot be expected to set the government investigators on the trail of fraud." Id. at 655. In determining whether a relator's complaint is "based on" a public disclosure, courts hold that if "essentially the same

scheme" alleged in a qui tam suit was the primary focus of the public disclosure, the bar applies. United States ex rel. Rahimi v. Rite Aid Corporation, 3 F.4th 813, 826 (6th Cir. 2021).

Importantly, unlike its federal counterpart, the TMFPA's public disclosure bar is not, and has never been, jurisdictional. CR.8303-04, 8313; United States ex rel. Prather v. AT&T, Inc., 847 F.3d 1097, 1102-03 (9th Cir. 2017); accord Rahimi, 3 F.4th at 826 (noting the non-jurisdictional bar is "more lenient to relators"). Accordingly, as the State argued in defending Ellis from a provider's claim that her allegations were publicly disclosed, federal courts applied the public disclosure bar "broadly and the original source exception narrowly in order to protect their limited jurisdiction," but "[t]his would not be appropriate in the instant case, as the public disclosure bar in the TMFPA is not jurisdictional . . . and Texas district courts have near universal jurisdiction." Because "the TMFPA seems to favor allowing even cases with significant public disclosures to go forward, see . . . §§36.110(b) & 36.113(c), this Court should construe the provisions of 36.113 against dismissal." CR.8313.

### B. No legislative or administrative report, hearing, audit, or investigation disclosed Xerox's fraud before Relators filed their *qui tam* petitions.

The State argues that two "legislative reports" and "hearings, audits, or

investigations"[4] were "pre-suit public disclosures inferring Medicaid fraud by Xerox[.]"Br. at 20. But these focused on the State, and did not disclose Xerox's fraud. As the trial court found, they showed that the State "took whatever Xerox said and moved on until the relators filed their *qui tams* and then did a real investigation." RR.Vol.5.103:3-18; *see also id.* 103:25-104:13.

### 1. The July 5, 2011, letter from the federal government to the State announced its planned audit of the State, not Xerox.

The July 5, 2011, letter from the U.S. Department of Health and Human Services to HHSC announced a forthcoming audit *of the State*, not Xerox. CR.4482-83[5]. The planned audit was to "review *the State's controls*[,]" and the letter noted that the State was subject to these audits (and required to assist with them) as the recipient of federal funds. *Id.* (emphasis added). This is confirmed by the resulting audit report released nearly four years later: the "State agency"— defined as HHSC, not Xerox—was the subject of the eventual audit. CR.6837.

Contrary to the State's claims in its brief, Br. at 22, the letter did not "announce" that the federal government "had become aware that Texas Medicaid was paying for a suspiciously large number of orthodontic claims[.]" It said

---

[4] The State no longer argues that the January or May 2011 private correspondence between HHSC and Xerox, Br. at 6, were public disclosures, nor could it, since these concerned a single orthodontist and were not public. *See Little v. Shell Exploration & Production Co.*, 690 F.3d 282, 292 (5th Cir. 2012) (government investigatory materials never disseminated into public domain are not public disclosures, since "public" means "exposed to general view").

[5] The State cites to the appendix to its original motion for summary judgment, CR.3903-5201, but that was later superseded by its amended motion. CR.6147-7601. For ease of reference, Relators use the State's citations here.

nothing about the volume of claims, only describing the objective of the planned audit as "to review the State's controls to ensure that only medically necessary orthodontic cases are paid." CR.4482. Likewise, it did not, as the State says, Br. at 31, allege "that Xerox did not comply with Medicaid criteria and guidelines." *Accord id.* at 32. It does not mention Xerox at all, nor did it make any allegations of noncompliance with any criteria.

Even if the letter was an "audit," and even if it described some federal awareness that the State or Xerox was paying a large volume of orthodontic claims, that would not be a public disclosure of Relators' allegations, since it contains neither a direct allegation of fraud nor both a misrepresented state of facts and a true state of facts so that fraud may be inferred. *Poteet*, 619 F.3d at 110; *Little*, 690 F.3d at 292; RR.Vol.5.103:17-18.

> 2. *The January 24, 2012, testimony did not contain public disclosures of Relators' allegations or transactions against Xerox.*

The recording of the January 24, 2012, legislative hearing is longer than seven hours, and the State argues that 21 seconds of it publicly disclosed Relators' allegations. Specifically, it points to the HHSC Commissioner's testimony that (1) he expected that "we probably [are] going to find as we go through this, our contractor didn't follow some of the policies and procedures they should have," Br. at 27 (citing CR.4534 at 2:51:00-2:51:12), and (2) "'internally, I believe that as a Medicaid agency, we may have delegated review

30

of the—of the dental policies too much that contractors [ACS] took advantage.'"

*Id.* (citing CR.4531 at 3:24:41-3:24:50).

Neither of these brief excerpts discloses Relators' allegations of fraud by Xerox. The first is simply speculation that HHSC might find, at some later time, that the contractor did not follow "policies and procedures" that it should have. This means, of course, that HHSC had not yet made such a finding. The statement is preceded by the Commissioner finding fault with HHSC. CR.4531 at 2:50:48-2:50:59. And immediately after the excerpt cited by the State, he went on to place blame on *the providers* who "gamed and manipulated the system." *Id*. at 2:51:12-2:51:22.

The second statement does not say what the State claims it does. The State asserts that it involved testimony that "contractors [ACS] *took advantage*." Br. at 27 (emphasis added). The audio of this portion of the testimony is difficult to decipher, but it does not contain "took advantage." As best as Relators can determine, the testimony is "contractors *knew*." CR.4531 at 3:24:49-51. This evidence is at most ambiguous, and cannot be construed against Relators. *See, e.g., Roark v. Stallworth Oil and Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991) ("When a writing is ambiguous. . . and is subject to more than one construction, we must indulge the construction that favors the non-movant.").

But even if the State were correct, this testimony would only establish that

Xerox/ACS "took advantage" of the State delegating its "review. . . of dental *policies,*" not in fraudulently approving orthodontic claims and concealing its TMFPA violations. Because this testimony contains no direct allegations of fraud or sufficient information from which a listener could infer fraud, it is not a public disclosure.

**C.      No news media put the State on notice of Xerox's fraud before Relators filed suit.**

For years the State endorsed Dr. Ellis as an "original source" in the face of the same WFAA and Texas Watchdog articles it tries to wield against her now, including in 2016, after a provider-defendant named in her *qui tam* petition, Dr. Malouf, filed for summary judgment arguing the stories barred her under §36.113. CR.8043-47; CR.8061. In response, the State argued that the articles—even those identifying Malouf by name—were not public disclosures and did not bar Ellis, since "general statements that [a type of fraud] is 'proliferating' are 'inadequate to trigger the disclosure bar on their own[,]" CR.8314 (citing, *inter alia*, *Little*, 690 F.3d at 293 and *Cooper*, 19 F.3d at 566), and because they did not include either Z or X+Y, as required by *Springfield Terminal*, 14 F.3d at 654. CR.8315.

What the State told the court in the *Malouf* case about these articles supports the trial court's reading of the exact same articles here: they merely "disclose certain individuals' concerns about the corporate practice of dentistry

and the ways in which the *State of Texas* was approving orthodontic services covered by Medicaid, but there are no specific, tangible allegations of fraud. . . such general allegations of suspected industry-wide fraud cannot bar specific, tangible claims related to the fraud of specific providers." CR.8319 (emphasis added); *see also* CR.8403-16 (describing and analyzing the articles). As the trial court held, the State "can and must be" held to its prior claim that these were not public disclosures. RR.Vol.5.51:19-23.

### 1. The May 13, 2011, WFAA article focused on the State and providers.

The first WFAA article on Medicaid orthodontics concerned severe overutilization, not fraud: it began with "Texas paid out over $184 million for Medicaid orthodontics last year," and explained that providers were lining their pockets. CR.4543. According to the article, "critics say *the state* simply doesn't evaluate claims." CR.4543 (emphasis added). It does not mention Xerox, ACS, TMHP, or fraud on the part of any of those entities;[6] instead, it notes that according to *the State,* an unnamed contractor processed claims and only rejects them "if paperwork is incomplete, not on a standard of medical evaluation." CR.4544. To the extent it identified potential unlawful acts under the TMFPA, it was on *the providers' part*, since they were the ones under "'pressure to push the

---

[6] The State incorrectly states that this piece alleged "that Xerox approved claims without properly reviewing them first" and that "Xerox did not follow proper Medicaid policies, procedures, and requirements[.]"Br. at 32, 33.

score when there's money at stake'" and who "'use that (evaluation) as an excuse to lie on that sheet because there's no checks on that sheet.'" CR.4544.

Other aspects of the article confirm that it did not disclose Relators' allegations against Xerox. The statement by an "HHS" employee explaining that it has been "concerned" about dentistry for a long time because "*for whatever reason*, we've had more trouble there than in other parts of Medicaid," CR.4544 (emphasis added), evidences that the State did not understand why it might have a "potential problem" with the orthodontics program. Similarly, the article notes that while the attorney general is responsible for prosecuting Medicaid orthodontic abuse, "the AG has not done so in the last two years." *Id.* In addition to not knowing why there may have been problems with the Medicaid orthodontic program, then, the State was not pursuing allegations in connection with Medicaid orthodontics.

As the State argued in 2016, this article "[r]eports general concerns that *the State* does not provide oversight" and contains "[n]othing more than the most general allegation from an anonymous source about *providers* 'lying'." CR.8403 (emphasis added). At most, it describes overutilization, individual orthodontic providers enriching themselves, and what the State then understood about how its contractor handled Medicaid claims, which fell short of fraud on the contractor's part. It does not name Xerox (or any related entity), so it cannot bar

Relators. *Little,* 690 F.3d at 293 ("general statements that a type of fraud is proliferating [are] inadequate to trigger the disclosure bar") (citations omitted, cleaned up); *Cooper v. Blue Cross and Blue Shield of Florida, Inc.*, 19 F.3d 562, 566 (11th Cir. 1994) (public disclosure must identify and contain "allegations specific to a particular defendant" named in the *qui tam*). Even if it did, the piece makes clear that the State was not aware of the reason for the "potential problem[s]" with the program, and was not then investigating fraud by the providers or Xerox. Under the "X+Y=Z" formulation, the story only arguably captures some of X, the true state of facts. It does not describe any misrepresented state of facts (Y) or fraud (Z) by Xerox. Because disclosure of one variable without the other(s) is not enough to be a public disclosure, the May 13, 2011, WFAA article does not bar Relators.

### 2. The June 19, 2011, WFAA broadcast concerned wrongdoing on the part of dentists, orthodontists, and the State, not Xerox.

The June 19, 2011, WFAA broadcast[7] leads by noting Senator Nelson added two riders to HHSC's budget. CR.5198, G-4 at 0:20-:30. It then gives examples of orthodontists enriched at taxpayer expense, *id.* at 0:53-1:00, and states "News 8 has learned that nearly a quarter of all the braces paid for under

---

[7] The State's brief identifies a "June 19, 2011, WFAA broadcast" as a public disclosure, but the brief's citations are to its exhibit "G-1," which is a May 13, 2011, video file. Br. at 21, 28, 29, 30 (citing "Ex. G-1, C.R. 5197"); CR.5198 (listing G-1 as dated May 13, 2011). The June 19, 2011, video was attached as G-4 to the State's motion for summary judgment, *id.*, and Relators address that here.

Medicaid last year in Texas may have been installed by *waiving State regulations*." *Id.* at 1:12-1:21. It reports that "the State dental director from Texas Medicaid Health Partnership" had to personally approve cases for children under 12, and calculates that this would have been 19,000 children "that got that special approval *from the State last year*." *Id.* at 1:46-2:00. "But clearly," Nelson said, "these are thousands and thousands of children who are getting braces, not because of a health-related reason." *Id.* at 2:00-2:10.

Nelson said one of her riders was intended to alter "the way dentists are reimbursed," because "clearly we need to see if there are certain companies or individuals that are not being totally honest about what they are doing." *Id.* at 02:20-:34. Another was intended to direct HHSC-OIG to "detect, investigate, and prosecute abuse *by dentists and orthodontists* who participate in the Texas Medicaid Program." *Id.* at 2:35-2:45. Nelson added "*if we are allowing that to take place, then it's shame on us*. We need to bring on more inspectors and make sure it's not going on." *Id.* at 2:46-:53.

The State's brief repeatedly, and erroneously, claims that this portion of the story says that "*ACS* was approving claims 'not because of a health-related reason.'" Br. 29, 30 (emphasis added). In fact, this video clearly describes the approval as coming from "*the state*." G-4 at 1:46-2:10. As the State noted in its 2016 summary of the article accompanying this broadcast, it merely "[r]eports

36

*Texas* is not enforcing the rules." CR.8405 (emphasis added). It otherwise focused on the orthodontic providers, not Xerox. To the extent it can be said to explicitly allege any wrongdoing, it was on the part of providers and the State itself for "allowing that to take place," not Xerox. Because it does not mention Xerox at all, nor reveal any of Relators' allegations of fraud or its essential elements, it does not bar Relators' petitions. *Cooper*, 19 F.3d at 566 *Rahimi*, 3 F.4th at 824.

### 3. The August 25, 2011, WFAA article describes the State's denial of fraud in the Medicaid Orthodontics Program.

The August 25, 2011, WFAA article describes "questionable Medicaid spending" on orthodontics and reports that federal auditors are *"auditing the Texas Health and Human Services Commission[.]"* CR.4546; *accord* CR.8406 at A-6 (State's 2016 description of this article "raising concerns about the State's controls"). It reiterates the extreme "expenditure" of Texas Medicaid orthodontics, and is the first instance in which Dr. Ellis—who the story explains "has gone to Washington twice to try to convince lawmakers to curtail Texas Medicaid orthodontics payments"—was quoted. CR.4547.

The article quotes a state official—Billy Millwee of Texas HHSC—as *denying fraud* in the State's view: according to the piece, Millwee said "Texas children do not receive cosmetic braces on their teeth under Medicaid." CR.4548. He indicated that "TMHP employed several 'dental consultants' who might be

helping" its director review the requests for braces for children under 12, and attributed the increased orthodontic expenditures to "probably more visits being made (to orthodontists) than should be made." *Id.* Finally, he said "if taxpayers money had been lost, the attorney general might take action to get it back." *Id.*

This piece once again fails to contain the X, Y, or Z required to amount to a public disclosure of the TMFPA allegations first brought in Relators' petitions. *Springfield Terminal*, 14 F.3d at 654. At most, some of the true state of affairs (the X) is described, but a public disclosure requires that the misrepresented state of facts (Y), or the full allegation of fraud itself (Z), be publicly disclosed as well.

### 4. The August 30, 2011, HHSC news release did not disclose any of Relators' allegations or transactions.

The August 30, 2011, HHSC news release stated that it was taking steps to "strengthen the authorization process for braces while still ensuring that children on Medicaid are able to get all medically necessary services." CR.4507-4508. It noted that the 2007 Legislature approved a rate increase to "expand access to dental services for children on Medicaid," and as a result, orthodontic spending "has increased from $102 million in 2008 to $185 million in 2010." *Id.*at 4507. The sole reference to "fraud" is the statement that "[a]ny cases involving suspected fraud will be referred to the Office of the Attorney General." CR. 4508. This indicates that no "suspected fraud" had been found, which is confirmed by the State's later admissions that it did not begin investigating Xerox for fraud

38

until almost a year later, in June, 2012. CR.211, CR.27. It is also consistent with the quotes in the release from Suehs attributing the increased orthodontic expenditures to more children getting checkups during which "we're finding and treating problems[.]" CR.4507. He downplayed any other explanation, stating merely that "some requests for braces may have been approved in cases where state policy wouldn't cover that service[.]" *Id.*

This document cannot be a public disclosure of fraud, since it plainly does not contain a "direct allegation of fraud" or a misrepresented state of facts plus a true state of facts from which the reader could infer fraud. *Poteet*, 619 F.3d at 110; *Springfield Terminal*, 14 F.3d at 654. Instead, it identifies increased orthodontic expenditures, attributes them to increased funding and the resulting increased access to services, and then describes the State's discussions with its (unnamed) contractor in contractual performance terms.[8] This is not a public disclosure of any of Relators' allegations or transactions, and does not bar them from receiving a relator's share.

> 5. *The September 1, 2011, Columbia Journalism Review article summarized WFAA reporting that blamed providers and the State.*

The September 1, 2011, Columbia Journalism Review article summarized

---

[8] This understanding is confirmed by then-contemporaneous internal correspondence at Xerox about the release. CR.7970 ("HHSC is considering issuing [a] news release in the coming days to talk about some of the procedural changes that are being made. . . ACS would **not** be mentioned") (emphasis in original).

WFAA's previous reporting as "tak[ing] on the *Texas Medicaid agency* and its spending spree for braces for poor kids." CR.4553 (emphasis added). "*The State* may not be looking too closely at what it is paying for, or perhaps looking the other way." *Id.* (emphasis added). And contrary to the State's suggestion in its brief, Br. at 24, it did not identify ACS at all. Instead, it alludes, as WFAA did, to "the contractor" as described by the State in the May 13, 2011, WFAA piece. CR.4553 (quoting and paraphrasing CR.4544).

This confirms that the thrust of the WFAA reporting was the enrichment of Medicaid providers at taxpayer expense. As an example of "just who is committing the waste and abuse [the public] hear so much about from politicians," the piece called out Dr. Malouf. According to the article, it's "for-profit medical enterprises" like his that WFAA exposed as taking "gobs of taxpayer money." CR.4553.

None of this discloses the X, Y, or Z of Relators' TMFPA allegations against Xerox. It instead publicized WFAA's coverage of the State's incredible spending on Medicaid orthodontics, but it—like WFAA—attributed the wrongdoing to the State itself and the orthodontic providers bilking Medicaid, not Xerox.

> *6. The November 11, 2011, WFAA broadcast describes ACS's activity-based compensation, provider wrongdoing, and again blames the State.*

The November 11, 2011, broadcast identifies the State's Medicaid

contractor as ACS and describes "how it pays its employees," Texas Ex. G-8, CR.5197 at 0:21-:25, claiming this may have implications for how "claims are processed nationwide." *Id.* at 0:05-08. It begins with a parent who paid for his child's braces out-of-pocket at the office of Dr. Herrscher (another provider first named in Dr. Ellis's *qui tam* and for which the State paid her a relator's share, CR.7707-09), observing that the office is full of other children whose braces are covered by Medicaid. *Id.* at 1:12-1:27. It describes ACS as the company that approved the orthodontic care and says it "does not reveal its methods and is protected by the state of Texas." *Id.* at 1:35-45. It calls ACS "a virtual assembly line of claims processing. . . at its Austin facility, hundreds of workers analyze claims and pass them on for payment by taxpayers. But the State won't let us talk to ACS." *Id.* at 1:45-2:03.

Harris then interviews Billy Millwee of HHSC, which "oversees ACS for the state but is also partners with ACS in a venture called ACS/TMHP." *Id.* at 2:10-2:22. Millwee says "ultimately, I'm accountable for what ACS does." *Id.*at 2:23-26. An anonymous former ACS employee added "your tax dollars aren't working. You're paying for services that shouldn't be paid for." She went on to describe "a system where people are rewarded for ignoring problem claims." *Id.* at 2:33-2:54.

The story pivots to documents obtained by WFAA showing that HHSC

"became aware of millions of dollars of exceptional charges *by dozens of Texas orthodontists* nearly two years ago." *Id.* at 02:27-03:26. Harris then speculates that "the way ACS pays its workers, a policy called Activity Based Compensation" ("ABC") "may be behind the problem" since it required ACS employees to process more claims in less time. *Id.* at 3:30-4:30. It concludes by quoting the parent paying out of pocket: "If the government is allowing it to go on, that's just… it's unbelievable." *Id.* at 5:10-5:16.

While this story describes ABC and speculates that it may explain why orthodontists were making such huge profits, it also states that ACS does not reveal its prior authorization methods, meaning WFAA could not report them. The story does not describe any of Relators' other allegations against Xerox/ACS. But even assuming, *arguendo,* that this is a public disclosure, LaFountain and Ellis are original sources, as explained in detail below.

### 7. The December 16, 2011, WFAA broadcast lays blame on the State, not Xerox.

The December 16, 2011, story explained that the Texas Senate would hold hearings the next year. It quotes Dr. Ellis as saying the Medicaid orthodontic benefit is "abused." CR.5157, Ex. G-9 at 0:31-0:33. It quotes the aforementioned out-of-pocket-paying parent as placing the blame *on the State*, saying "I'm very disappointed in the officials that we elect." *Id.* at 0:48-:52. It reiterated that ACS paid its employees based on volume, not on the quality of their work, and then

42

included Senator Nelson expressing concern about "where else is this going on" and stating "if there was fraud taking place . . . somebody needs to be held accountable for that." *Id.* at 1:05-:50.

This story did not accuse Xerox of fraud, or say that it had been or would be investigated for fraud. To the extent it mentioned ACS paying its employees for speed over "how well they do the work," as described above and detailed below, even if this is a public disclosure of the ABC allegation, both Mr. LaFountain and Dr. Ellis are original sources.

> 8. *The December 27, 2011, WFAA article focuses on the State, not Xerox, and does not describe fraud.*

The December 27, 2011, WFAA story summarizes prior WFAA reporting. CR.4550-52. It states that WFAA's investigators "find *Texas regulators* seldom deny procedures for hundreds of thousands of children," that "individual dentists and their corporations [] collect increasing millions of dollars[,]" and that "[t]he state agency overseeing the program has initiated a series of reforms, including hiring a new dental director, several orthodontists and 10 additional staff members." *Id.* at 4551. It goes on to say that the State directed its unnamed contractor to develop a "corrective action plan" and that "if the Medicaid-approved services don't meet the state criteria, possible fines and reimbursements from providers and the state contractor may be levied."

As the State recognized in 2016, this reporting fails to include allegations

or transactions sounding in fraud. CR.8412 at A-15. What is more, it again attributes failures and misconduct to the State. There is no substantial identity between this reporting and Relators' detailed allegations against Xerox, so this article does not bar Relators. *Rahimi*, 3 F.4th at 826.

> 9. *The January 25, 2012, Texas Watchdog article is about the State's investigation into orthodontists and denies fraud.*

The State is simply wrong in claiming, Br. at 27, that this article reported that it was then "investigating Xerox for improper conduct based on its failure to properly review orthodontic claims." The piece does not mention Xerox or any related entity at all; instead—as the State argued in 2016—it explicitly describes the investigation the attorney general's office disclosed at a legislative hearing as one "looking into fraudulent Medicaid billing *by 31 orthodontists*[.]" CR.4554 (emphasis added); CR.8412 at A-16. It quoted Suehs of HHSC as testifying that "Some of *our providers* out there gamed and manipulated the system." CR.4554 (emphasis added). Indeed, according to the State in 2016, this article "[a]ctually denies there was fraud" even though it reported investigations of providers. CR.8412 at A-16.

This article confirms that prior to Relators filing their *qui tam* petitions and triggering the State to begin its investigation into Xerox, the State was focused on wrongdoing by individual providers, not Xerox. It does not bar Relators.

> **D.    Even if there was a public disclosure, LaFountain and Ellis are original sources.**

44

Under the TMFPA, an "original source" is someone who either "(1) has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the state" before filing her action "based on the information", or "(2) has knowledge that is independent of and materially adds to the publicly disclosed allegations and who has voluntarily provided the information to the state" before filing her action "based on the information." Tex. Hum. Res. Code §36.113(b). A relator need not be the original source of every element of his claims. *United States ex rel. Detrick v. Daniel F. Young, Inc.*, 909 F.Supp. 1010, 1021 (E.D. Va. 1995) (relator's complaint cannot be "derived completely from public information" but the FCA does not "require the complainant to have direct and independent knowledge of everything in his complaint"). The "information" for which he must be an original source is that underlying the allegations in his complaint, not the information underlying the alleged public disclosures. *Rockwell Intern. Corp. v. United States,* 549 U.S. 457, 471 (2007).

To be "direct," a relator's knowledge may be a result of involvement in the subject matter, his own observation, or his own investigation. *Cooper*, 19 F.3d at 568 (relator had direct knowledge where he learned of wrongdoing through his own insurance claims' processing, research, and correspondence with members of Congress and HCFA); *Rahimi*, 3 F.4th 813; *United States ex rel. Lisitza v. Par*

*Pharmaceutical Companies, Inc.*, 2017 WL 3531678 (N.D. Ill. 2017) (relator must have information based on own observation or investigation).

To be "independent," the information must not be entirely dependent upon publicly disclosed information. *United States ex rel. Reagan v. East Tex. Med. Ctr. Regional Healthcare System,* 384 F.3d 168, 177 (5th Cir. 2004); *United States ex rel. Harman v. Trinity Industries, Inc.*, 2014 WL 47258 (E.D. Tex. 2014) (relator's information independent where significant portion stems from personally gathered information, notwithstanding that some fraction of the facts are contained in public documents as "claim is not made parasitic by the public availability of a single brick"). The relator should "be someone who would have learned of the allegation or transactions independently of the public disclosure," *Glaser v. Would Care Consultants, Inc.*, 570 F.3d 907, 921 (7th Cir. 2009) (quotation and citation omitted).

### 1. The TMFPA's original source exception favors relators.

In response to multiple motions to strike Dr. Ellis on public disclosure grounds, the State argued that the TMFPA's original source exception should be construed liberally and in favor of relators:

> The TMFPA as a whole should be broadly construed to favor the State's interests in fighting fraud against the Medicaid program. To this end, section 36.113 in particular should be narrowly construed to limit the types of disclosures that would bar participation by relators, and, conversely, should be broadly construed to expand

the circumstances in which a relator is considered "an original source." Such interpretation furthers the intent of the legislature to: (a) provide the Attorney General with an effective tool to discourage and punish fraud against Medicaid; and (b) encourage relators to come forward with information about schemes to defraud Medicaid.

CR.7986, CR.8012, CR.8027. It further noted that "information which happens to be similar or identical to publicly disclosed allegations or transactions, but which derives from some other source than the public disclosure, is not parasitic, and should not be barred by a provision meant to bar parasitic lawsuits." CR.7981, n.6 (quotation omitted); CR.8007, n.9 (same).

Applying these considerations here, this Court should hold that there were no public disclosures, or in the alternative, even if there were, LaFountain and Ellis are original sources.

## 2. *LaFountain is an original source under §36.113(b)(1).*

LaFountain voluntarily provided the State information about Xerox's fraud prior to filing his petition as required by §36.113(b)(1). He met with OIG to discuss Xerox and his employer multiple times, and in 2011 specifically addressed his concerns about Xerox approving Medicaid orthodontic treatment that did not qualify for reimbursement. *Supra* at 7. That he met with OIG after it initiated an investigation into his employer does not render his disclosure involuntary; at the time he met with them, OIG was investigating his employer's marketing practices, not ACS's fraud. CR.7242 at 74:13-CR.7243 at 76:17.

LaFountain's knowledge was direct and independent, since it derived from his personal involvement in Medicaid orthodontics. *Glaser,* 570 F.3d at 921; *Reagan*, 384 F.3d at 177; *Harman*, 2014 WL 47258. His employer's business model was dependent on Xerox's fraudulent pre-approvals, and he learned the information on which he based his allegations on the job while his employer exploited the very fraud on Medicaid that he alleged Xerox committed. CR.7692 at ¶¶3-8. Contrary to the State's argument, this is sufficient for LaFountain to qualify as an original source under §36.113(b)(1); he does not need to also show that he "materially added" to any public disclosures under that provision.

### 3. Dr. Ellis is an original source, as the State has repeatedly admitted.

The State has repeatedly defended Dr. Ellis as an original source against provider-defendants' attempts to bar the allegations in her petition. CR.140-41; CR.153-74; CR.178-204.  For example, in 2016, in addition to arguing that there were not any public disclosures, the State argued that even if there were, Ellis was an original source: even though she had never worked for or with Dr. Malouf (or any defendant she named), her knowledge was "independent" because it was not based solely on information available in the public domain, or from her access to files as an OIG contractor. CR.8320-21. Her information was "direct" because it was derived from her "personal experiences, insights, treatment of patients, and

contacts gained from over 16 years as a practicing orthdontist with experience and familiarity with the Texas Medicaid program, as well as [her] analysis and independent research of materials, anecdotes, and documents." CR.8321. The State went on to argue that "[i]n fact, Dr. Ellis is *exactly* the kind of relator that Senator Grassley, who sponsored the 1986 amendments to the federal FCA, indicated would be protected under those amendments" *Id.* at n.11 (emphasis in original).

The State's argument then remains correct now. Dr. Ellis based her allegations on the information she personally gathered well before she filed suit, including what she provided to both OIG and WFAA. She testified repeatedly that she knew about Xerox's fraud before WFAA's first story on Texas Medicaid, CR.7411 (42:11-19), CR.7414 (45:17-46:1), CR.7416 (47:24-48:22), and the undisputed record shows that far from deriving her information from WFAA or OIG, she was the one who first suggested they pursue Xerox. CR.6727 ¶9, CR.7698-99.

Turning specifically to the WFAA stories focusing on "fraud in the Texas Medicaid orthodontics program," in 2016 the State said she was plainly an original source of those, too: "Dr. Ellis possesses knowledge that is 'independent of and materially adds to' the information contained in the news media [for those stories]. In fact, Dr. Ellis herself provided background information, on-air and

off-air opinions, and her consulting expertise to develop the news media stories reported by Mr. Harris." CR.8321.

The State also invoked Ellis's pre-suit voluntary reporting to OIG to counter Malouf's attempts to bar her under §36.113, accusing Malouf of ignoring—as the State does now—"critical evidence demonstrating that Dr. Ellis had voluntarily communicated her concerns regarding potential fraud in the Texas Medicaid orthodontic program for several years, at least as far back as 2009, including to her superiors in the OIG's office." CR.8322. That evidence shows that in 2011 she urged OIG to investigate Xerox, and was rebuffed; she then turned to the legislature starting in January 2012, urging Senator Nelson's committee to investigate Xerox and its policy of rubber-stamp approval. CR.6660. She also suggested that WFAA investigate ACS/Xerox for its role administering TMHP nearly two months *before* its November 11, 2011, story that first named the contractor. CR.7698-99.

Now, however, the State argues that because she was once a contractor[9] retained "to disclose fraud," her disclosure to the government was "not voluntary." Br. at 39-40 (citing *Little*, 690 F.3d at 294). This argument fails for several reasons. First, she was retained to assist with a "medical provider integrity

---

[9] The state incorrectly asserts she was a "salaried contractor." Br. at 40. She did not receive a salary, and was "not a full-time government employee, nor was she an auditor . . . she was contracted for a limited and discrete purpose." CR.8327.

and quality review," CR.8648, and to "identify billing exceptions and quality of care concerns as applicable" with respect to *orthodontic providers*, not Xerox. CR.8649. She testified that her work was to review specific orthodontists' claims "for billing code errors." CR.7461 92:11-13.

Second, as the State argued in defense of Dr. Ellis in 2013, "no federal court has ever accepted the argument that government employees *per se* can *never* be relators in a *qui tam* action . . . the mere fact that a relator discovers the fraud in her capacity as a government auditor does not disqualify her from prosecuting a *qui tam* action under the FCA." CR.8325-26 (collecting cases holding that government auditors may bring *qui tam* actions) (emphasis in original). Third, as the State also argued in 2013, the portion of the *Little* case it cites now is dicta, but even if it were not, "much of the information that provides the foundation for [Ellis's] complaint was gleaned outside her role as a State contractor and could not therefore be said to [] have been provided 'involuntarily.'" CR.8326-27.

### III. Neither LaFountain nor Dr. Ellis Is Barred by the First-to-File Bar.

#### A. The Third Court of Appeals has already held that the first-to-file bar does not apply to LaFountain and Ellis.

The State's plea to the jurisdiction argued that sovereign immunity barred—via the TMFPA's first-to-file provision—anyone but the first-filed relator from seeking a relator's share. CR.2614-22; RR.Vol.3.25:10-26:9; 31:3-

17. The trial court denied the plea, and the State appealed, urging error because "the *qui tam* actions of Ellis and LaFountain were barred by the TMFPA's first-to-file bar." *Ellis*, 681 S.W.3d at 510. The Third Court affirmed, holding that "the State did not conclusively establish that appellees' *qui tam* actions were barred by the first-to-file provision." *Id.* at 516. In doing so, it applied the same standard that applied to the State's subsequent motion for summary judgment. *Id.* (citing *Garcia*, 372 S.W.3d at 635) ("explaining that review of evidence in plea-to-the-jurisdiction context mirrors that of a motion for traditional summary judgment.").

On remand, the State's motion for summary judgment nevertheless again argued that the first-to-file bar applied. CR.6198. After briefing and argument, the trial court denied it. CR.9171. Now, in its second appeal, the State makes the same arguments for a fourth time. They should be rejected again.

## B. The State cannot rely on evidence beyond the TMFPA petitions themselves to establish that they are barred.

As an initial point, the State cannot rely on evidence beyond the relevant TMFPA petitions in its first-to-file challenge. As explained in the federal cases the State relies, Br. at 44-49, first-to-file challenges are decided by comparing the four corners of the petitions alone. *See United States v. Planned Parenthood of Houston,* 570 F. App'x 386, 390 (5th Cir. 2014) ("the first-to-file analysis requires comparison of the two original complaints"); *United States ex rel. Health v. AT&T, Inc.*, 791 F.3d 112, 121 (D.C. Cir. 2015) ("Similarity is assessed by

comparing the complaints side-by-side").

Accordingly, Relators' deposition testimony describing their understanding of the others' petitions vis-à-vis their own has no bearing on the legal question of whether the first-to-file bar applies, and the Court should not consider it. Similarly, Relators' counsel's answer to the trial court's question about the existence of a sharing agreement is irrelevant to question of whether the first-to-file bar applies; it was not a basis for the Relators' opposition to the State's motion for summary judgment or the trial court's order denying it. Br. at 48-49. In fact, the trial court explicitly said it would not consider the agreement in ruling on the parties' motions. RR.Vol.5.15:17-18 ("it's not part of what I need to consider. I'm just kind of curious.").[10]

Even if the sharing agreement was relevant, the single case the State relies on is not, since it concerned an attorneys' fee dispute between a settling defendant and later-filed relators, not a relator's share payable by the government. *United States v. AthenaHealth, Inc.,* No. CV 17-12125-NMG, 2022 WL 658654, *4-5 (D. Mass. Mar. 3, 2022)[11] (comparing complaints and holding that only the first-

---

[10] In *State v. Ellis*, the Third Court of Appeals noted that it "appears to be common practice, at least under the FCA, for multiple relators to work together and share resulting proceeds" via these kinds of agreements when the government settles their claims. 681 S.W.3d at 514 (collecting cases).

[11] Relators are unable to locate the quote the State attributes to this case at page 49 of its brief. ("Like the FCA, the TMFPA, 'affords the government broad authority and contemplates that the government will serve a gatekeeping function.' *Id.* at 158.")

filed relator could seek statutory fees and costs from the defendant, and sharing agreement did not alter the court's conclusion), *aff'd sub nom. United States ex rel. Lovell v. AthenaHealth, Inc.*, 56 F.4th 152 (1st Cir. 2022).

### C. LaFountain and Ellis are not barred by the first-to-file provision.

The first-to-file bar does not preclude LaFountain or Ellis from claiming a statutory share of the settlement that resolved their TMFPA claims, because neither alleges merely the "same material or essential elements of fraud" described in Alvarez's complaint or, in the case of Dr. Ellis, LaFountain's complaint. *Ellis*, 681 S.W.3d at 505. Instead, LaFountain and Ellis's petitions include different allegations of fraud later restated and settled by the State in its -581 Action, so the first-to-file bar does not apply.

The point of the bar "is not to allow isolated misconduct to inoculate large companies against comprehensive fraud liability." *United States ex rel. Heath v. AT & T, Inc.*, 791 F.3d 112, 116 (D.C. Cir. 2015) Accordingly, "[m]ere notice—particularly of a different fraud than the government chose to pursue—is not enough. . . we must ask not merely whether the first-filed complaint provides some evidence from which an astute government official could arguably have been put on notice, but also whether the first complaint contained *all the essential facts* of the fraud it alleges." *United States ex rel. McGuire v. Millenium Labs, Inc.*, 923 F.3d 240, 254 (1st Cir. 2019) (quotation and citation omitted) (emphasis

in original). The "essential facts" are the "actual mechanism" of the fraud. *Id.* at 253. Later-filed petitions that merely "widen the circle of victims of the same fraudulent conduct" will be barred, *Heath*, 791 F.3d at 121-122, as will petitions that merely allege "different details, different geographic locations, and different wrongdoers" of the same fraudulent scheme. *United States ex rel. Branch Consultants v. Allstate Ins.,* 560 F.3d 371, 378 (5th Cir. 2009).

In *Branch Consultants*, for instance, the first complaint alleged "insurance companies defrauded the federal government by mischaracterizing wind damage as flood damage in the wake of Hurricane Katrina[,]" specifically focusing on homes in Mississippi. *Id.* at 374. The second complaint made the same allegation, but also added examples of the same conduct extending to 57 properties in Louisiana. *Id.* at 375. The Fifth Circuit held that because the second complaint brought "identical allegations" against two of the same insurers, merely adding facts related to properties in a neighboring state, it was barred by the first. *Id.* at 378-79.

In contrast, a later complaint that adds claims of different or further-reaching fraud is not barred by the first-filed complaint. In *Heath*, the D.C. Circuit compared two complaints, the first alleging fraud committed by individuals within a single AT&T subsidiary who made specific, overt misrepresentations to schools and libraries about the existence of lower prices to

which they were entitled, and knowingly submitted reimbursement requests for excessive prices. 791 F.3d at 118, 121-122. The later-filed complaint alleged nationwide disregard for the lowest-price requirement, including the intentional failure to enforce or even train employees on the requirement or to incorporate it into its billing practices. *Id.* at 121. By adding claims of further-reaching fraud "grounded in institutionalized training and enforcement failures, and compounded by efforts of concealment[,]" as opposed to the affirmative misrepresentations of lower-level employees alleged in the first complaint, the later complaint's fraudulent scheme was materially distinct from the first complaint. *Id.*

Applying this reasoning here, Alvarez's suit bars neither LaFountain's nor Ellis's. She was first to allege that Xerox approved prior authorization requests for cosmetic braces for patients with HLD scores that did not credibly meet or exceed the 26-point threshold, and who were under 12. CR.6224-41 ¶¶6, 27, 29, 51, 52. She did *not* allege the additional, factually-distinct fraudulent schemes in LaFountain and Ellis's petitions—and later alleged in the -581 Action—namely, that Xerox used activity-based compensation to incentivize staff to approve *all* prior authorization requests without properly reviewing them to detect fraud, CR.6338-39 ¶58 (LaFountain), CR.6739-40 ¶21 (State); that Xerox used untrained and unqualified staff to review *all claims* (not just claims for cosmetic

56

braces or children under 12), CR.6505 ¶4.20, CR.6531-32 ¶¶11.01, 11.02 (Ellis); CR.6738-50 ¶¶17, 27, 33, 39 (State); and that Xerox concealed all of this from the State in violation of the TMFPA, CR.6533 ¶11.03 (Ellis), CR.6751 ¶40 (State).

The State misleadingly asserts, Br. at 46, that because Alvarez wrote a "disclosure letter" to the State describing Xerox's activity-based-compensation allegation after she filed her petition, LaFountain's petition—plainly the first to state this allegation, since it appears nowhere in Alvarez's petition—is barred. This is not the law. As the State recognizes elsewhere, the first-to-file bar applies to allegations made in a relator's *petition*, not to information otherwise supplied to the government via alternative channels. Br. at 44; *Ellis*, 681 S.W.3d at 505-06.

The State further claims that this activity-based-compensation allegation is barred because it "is not fraudulent in and of itself, it is merely a factual detail that adds to the essential element of fraud—that Xerox employees were not following Medicaid guidelines and were not properly reviewing claims." Br. at 46. This, too, is wrong: Alvarez's claim that Xerox approved authorization requests for cosmetic braces is not the same as LaFountain's allegation that its staff were incentivized in a way that prevented them from properly reviewing *all* authorization requests. If the State's logic was right, the later-filed complaint in

*Heath* would be barred, too, since the allegations of the defendant's intentional failure to enforce or train on the lowest-price requirement arguably just added a mere "factual detail."

With respect to Dr. Ellis's petition, neither Alvarez nor LaFountain alleged, as Ellis did, that Xerox used unqualified and untrained personnel to review and approve prior-authorization requests. The State previously conceded that Dr. Ellis was the only Relator to state this allegation. CR.2617-18; CR.7677; RR.Vol.3.69:20-24. Alvarez's allegations, that Xerox approved prior-authorization requests for cosmetic braces and children under 12, encompass only a subset of prior-authorization requests at issue in Ellis's petition, which included every request reviewed by unqualified and untrained staff, regardless of whether they were for cosmetic braces or children under 12. This is an independent basis for liability under the TMFPA, which is why the -581 Action includes it as a distinct TMFPA violation. CR.6750 ¶39 (listing violations regarding "application and enforcement of Medicaid policy with regard to orthodontic treatment" as well as the "provision of adequate medically knowledgeable personnel to make medical necessity determinations").

Similarly, there is no dispute that Ellis was the only Relator to allege that Xerox knowingly misrepresented material facts and knowingly concealed information that permitted it to receive Medicaid payments that were

unauthorized or greater than what was authorized. The State now claims, Br. at 47-48, that this merely added factual detail to the schemes alleged by Alvarez and LaFountain. But once again, in its -581 Action the State listed each of these as independent TMFPA violations. CR.6750-51, ¶39 (Xerox used false statements and misrepresented material facts to HHSC in violation of §36.002(1)); ¶40 (Xerox concealed information regarding its application and enforcement of Medicaid policy regarding orthodontic treatment in violation of §36.002(2)). Even if it hadn't, these allegations would not be barred: where later-filed complaints add allegations of different, further-reaching fraud—including specifically allegations of concealment not alleged in the first complaint—the first-to-file bar does not apply. *See, e.g., Heath*, 791 F.3d at 121-122 (D.C. Cir. 2015) (second complaint including concealment allegation not barred by first that alleged affirmative misrepresentations of lower-level employees). Because Dr. Ellis's misrepresentation and concealment allegations are materially distinct from Alvarez and LaFountain's allegations, her petition is not barred.

If accepted, the State's argument would allow any first-filed petition alleging the broadest possible fraud—that a defendant was simply "not following Medicaid guidelines"—but giving the government no meaningful information about TMFPA violations, to bar later-filed relators who make detailed, actionable allegations of specific TMFPA violations that were never stated previously.

59

Because neither the State's argument nor this outcome can be reconciled with the TMFPA or the intent behind it, the Court should reject them.

## IV.   The Trial Court Did Not Abuse Its Discretion in Awarding Pre-Judgment Interest

Prejudgment interest may be recovered when authorized by statute or under general principles of equity. *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998). The trial court may award prejudgment interest for periods of delay, including interlocutory appeals. *City of San Antonio v. Doyle*, No. 04-98-00286-CV, 1999 WL 89728, *6 (Tex. App.—San Antonio Feb. 24, 1999, pet. denied). "[U]nder Texas law an equitable award of prejudgment interest should be granted to a prevailing plaintiff in all but exceptional circumstances." *Bituminous Cas. Corp. v. Vacuum Tanks, Inc.*, 75 F.3d 1048, 1057 (5th Cir. 1996).

As it did below, the State misstates the law, claiming that if a statute is silent as to prejudgment interest, it is not available. But in the seminal case on prejudgment interest, *Cavnar v. Quality Control Parking, Inc.*, the Texas Supreme Court held that plaintiffs who brought claims based on the Wrongful Death Statute, the Survival Statute, and common law negligence were entitled to prejudgment interest on equitable grounds even though their statutory causes of action did not provide for prejudgment interest at the time. 696 S.W.2d 549, 552, 554 (Tex. 1985). The *Cavnar* rule that "prejudgment interest is recoverable on a

wrongful death claim against a private person"—even though the statute was silent—has subsequently been expanded to apply to the State, which is "also liable for such interest under the Texas Tort Claims Act." *State Dept. of Highways and Public Transp. v. Bacon*, 754 S.W.2d 279, 282 (Tex.App.—Texarkana 1988, writ denied) (applying *Cavnar* and awarding prejudgment interest even though it was not provided for in the statute). Other courts have reached similar conclusions for other statutory causes of action. *See, e.g., Origin Bank v. Castellano*, No. 4:21-CV-02173, 2024 WL 169664 (S.D. Tex. Jan. 12, 2024) (citing *Cavnar* and holding that "no Texas law [] provides for pre-judgment interest on TTLA claims but [the court] finds that it is appropriate based on equitable considerations"); *Morgan v. Ebby Halliday Real Estate, Inc.*, 873 S.W.2d 385, 388 (Tex. App.—Fort Worth 1993, no writ) (applying *Cavnar* and awarding prejudgment interest on equitable grounds in DTPA action).

The cases the State cites do not justify reversal of the trial court's interest award here. In *Nazari v. State,* 561 S.W.3d 495, 502 (Tex. 2018), and *In re Xerox,* 555 S.W.3d 581, 534 (Tex. 2018), the Court observed that the TMFPA is not a damages statute, but instead levies a penalty on TMFPA defendants who commit specified unlawful acts. Relators are not TMFPA defendants, and neither case concerned awards to them under §36.110. *In re Xerox* did, however, note that even though damages are not available under the TMFPA, the State may still

recover prejudgment interest under the statute. 555 S.W.3d at 521, 531.

The *Patriot Contracting* case did not hold, as the State suggests, Br. at 51, that "it is *only* '[w]hen no statute controls, an award of pre-judgment interest is governed by equitable principles[.]'" (emphasis added). There, the court *affirmed* the calculation of prejudgment interest based on a credit agreement in an action brought under Chapter 53 of the Texas Property Code, even though the statute did not provide for it. 650 S.W.3d at 659.

The remaining cases the State relies on do not concern prejudgment interest at all. *In re Ament,* 890 S.W. 2d 39 (Tex. 1994), involved professional misconduct and had nothing to do with prejudgment interest. Instead, the Court held that the state bar exceeded its authority in disciplining an attorney in excess of the compulsory discipline provided by statute. *City of Dallas v. Wright,* 120 Tex. 190 (1931), long predates *Cavnar* and did not concern prejudgment interest, so it, too, is inapposite. Similarly, the State cites *Union Carbide Corp. v. Synatzske,* 438 S.W.3d 39, 52 (Tex. 2014), for the proposition that where a statute does not provide for prejudgment or postjudgment interest, there is a presumption that the Legislature intended to omit it. Br. at 53. But that case did not concern interest, and if the State's argument was right, *Cavnar* and *Bacon* would be wrongly decided.

Finally, *Abbott v. G.G.E.*, 463 S.W.3d 633 (Tex. App.—Austin 2015, pet.

denied) affirmed a trial court's denial of the State's plea to the jurisdiction, not any kind of monetary judgment against the State. The statute at issue was the Persons with Mental Retardation Act, and the State claimed that because it prescribes remedies for enforcing rights under the act, they were exclusive, and the plaintiffs could not also seek relief under the UDJA. *Id.*at 651. The court of appeals disagreed, since the PRMA states that its remedies are nonexclusive. *Id.* at 651-652.

The award of prejudgment interest to Relators here serves the purposes laid out in *Cavnar*: "to expedite both settlements and trials" and "remove the current incentives for [the State] to delay as long as possible without creating incentives for [relators] to delay." 696 S.W.2d at 554. In consideration of the State's dilatory tactics and shifting positions, the trial court did not abuse its discretion in awarding prejudgment interest.

## V. Even if the Seven Percent Cap Applied, Relators Should Be Awarded More than a Nominal Amount.

The State claims that if Relators are entitled to an award, it must be capped at 7% under TMFPA §36.110(b). That provision applies where the court finds that the action is based on public disclosures "other than information provided by the person bringing the action." Relators do not agree that this provision applies for the reasons argued above. But even if it did, determining the amount of a relator's share is within the trial court's discretion, and should this Court hold

that the trial court applied the wrong statutory range, it should remand for its redetermination of an award percentage.

In terms of the significance of Relators' information, the record shows that it was their *qui tam* petitions that lead to the State to start investigating Xerox: according to the State, it began its investigation into the TMFPA allegations in June, 2012, months after their suits were filed. CR.211, CR.27 at I.D. The materials the State now claims concern "its own investigation" into the violations in 2011 do no such thing, since they are either private correspondence identifying "performance issues" for just a few orthodontic cases of a single provider, CR.1161-62, CR.1164-66, or identifying "areas where improvement was necessary," CR.1208. None of the cited material supports the conclusion that the State was already investigating Xerox for TMFPA violations. As the trial court found, the State "needed relators and you didn't have enough information to get to where you got and get $200 million from Xerox without them. You didn't have the information. It wasn't publicly disclosed." RR.Vol.5.103:12-16; *see also id.* at 103:25-104:13.

There is no dispute that both before and after filing her *qui tam* petition Dr. Ellis repeatedly encouraged OIG, the Legislature, WFAA, and the Attorney General's Office to pursue Xerox, not just the providers. CR.8321-22; CR.8753; CR.8785-87; CR.8823; CR.8842. In this way, she served a crucial role in

advancing the case to litigation, and this weighs in favor of a higher percentage of the recovery.

Finally, *United States ex rel. Burke v. St. Jude Med., Inc.*, No. CV-16-3611-SAG, 2021 WL 6135202 (D.Md. Dec. 29. 2021), is distinguishable. That relator was awarded a 0.5% share because her petition explicitly cited public disclosures as a basis for her allegations, and she did not claim her other allegations derived from independent knowledge. *Id.* at *6. She provided no non-public documents, information, or expertise. *Id.* at *8. Had she been an original source, she could have been awarded a 15% "finder's fee" for intervened actions; since she was not, she received a nominal fee for filing her case in court. *Id.*

Here, even if there were public disclosures and Relators were not original sources, their actions were based on their independent knowledge, not public disclosures. They each provided the government with their non-public information and expertise in Medicaid orthodontics, and Dr. Ellis in particular met with and trained the attorneys from the Attorney General's Office for many hours. Then those same attorneys she trained filed the -581 Action. CR.3357-58, CR.3519-20. As the trial court found, there is every indication that but for their *qui tam* petitions, the State would never have pursued a TMFPA action against Xerox. This warrants more than a nominal award.

## CONCLUSION AND PRAYER

For the foregoing reasons, the trial court correctly determined that Relators were entitled to a statutory share of the settlement that resolved their claims, and did not abuse its discretion in awarding them a 17.5% share, plus prejudgment and postjudgment interest. The Court should affirm the judgment.

Respectfully submitted,

*s/Caitlyn E. Silhan*

CHARLES S. SIEGEL
Texas Bar No. 18341875
csiegel@waterskraus.com
CAITLYN SILHAN
Texas Bar No. 24072879
csilhan@waterskraus.com
WATERS & KRAUS, LLP
3141 Hood Street, Suite 700
Dallas, Texas 75219
(214) 357-6244
(214) 357-7252 (fax)

JAMES MORIARTY
Texas Bar No. 14459000
Law Offices of James R.
Moriarty 4119 Montrose
Blvd., Suite 250
Houston, Texas 77006
(713) 528-0700
(713) 528-1390 (fax)

**Attorneys for Christine Ellis, DDS**

*s/ James "Rusty" Tucker*
JAMES "RUSTY" TUCKER

Texas Bar No. 20272020
Law Offices of James R. Tucker, P.C.
3100 Drexel Drive
Dallas, Texas  75205
(214) 505-0097
(214) 599-8874 (fax)
rusty@rustytuckerlaw.com

**Attorney for Alexandra Alvarez and Joshua LaFountain**

**CERTIFICATE OF COMPLIANCE**

Based on a word count run in Microsoft Word, I certify that this brief contains fewer than 15,000 words, excluding portions of the brief exempt from the word count requirement under Texas Rule of Appellate Procedure 9.4(i)(1). I further certify that it complies with the typeface requirements of Texas Rule of Appellate Procedure 9.4(e), as it was produced on a computer, printed in a conventional typeface no smaller than 14-point except for footnotes, which are 12-point.

*/s/ Caitlyn E. Silhan*
Caitlyn E. Silhan

# CERTIFICATE OF SERVICE

I certify that on August 11, 2025, a copy of this Brief for Relator-Appellees

was served via electronic filing and by email on:

Brian VanderZanden
Brian.Vanderzanden@oag.texas.gov

Brent Webster
Brent.webster@oag.texas.gov

Ralph Molina
Ralph.molina@oag.texas.gov

Austin Kinghorn
Austin.kinghorn@oag.texas.gov

Amy Snow Hilton
Amy.hilton@oag.texas.gov

**Counsel for Appellant State of Texas**

*/s/ Caitlyn E. Silhan*
Caitlyn E. Silhan

**APPENDIX**

TAB 1:  Text of the Texas Medicaid Fraud Prevention Act, Chapter 36, Texas Human Resources Code (2011)

TAB 2:  Text of the Code Construction Act, Chapter 311, Texas Government Code.

# TAB 1

# HUMAN RESOURCES CODE

## TITLE 2. DEPARTMENT OF HUMAN SERVICES AND DEPARTMENT OF PROTECTIVE AND REGULATORY SERVICES

## SUBTITLE C. ASSISTANCE PROGRAMS

## CHAPTER 36. MEDICAID FRAUD PREVENTION

## SUBCHAPTER A. GENERAL PROVISIONS

Sec. 36.001. DEFINITIONS. In this chapter:

(1) "Claim" means a written or electronically submitted request or demand that:

(A) is signed by a provider or a fiscal agent and that identifies a product or service provided or purported to have been provided to a Medicaid recipient as reimbursable under the Medicaid program, without regard to whether the money that is requested or demanded is paid; or

(B) states the income earned or expense incurred by a provider in providing a product or a service and that is used to determine a rate of payment under the Medicaid program.

(2) "Documentary material" means a record, document, or other tangible item of any form, including:

(A) a medical document or X ray prepared by a person in relation to the provision or purported provision of a product or service to a Medicaid recipient;

(B) a medical, professional, or business record relating to:

(i) the provision of a product or service to a Medicaid recipient; or

(ii) a rate or amount paid or claimed for a product or service, including a record relating to a product or service provided to a person other than a Medicaid recipient as needed to verify the rate or amount;

(C) a record required to be kept by an agency that regulates health care providers; or

(D) a record necessary to disclose the extent of services a provider furnishes to Medicaid recipients.

(3) "Fiscal agent" means:

(A)  a person who, through a contractual relationship with the Texas Department of Human Services, the Texas Department of Health, or another state agency, receives, processes, and pays a claim under the Medicaid program;  or

(B)  the designated agent of a person described by Paragraph (A).

(4)  "Health care practitioner" means a dentist, podiatrist, psychologist, physical therapist, chiropractor, registered nurse, or other provider licensed to provide health care services in this state.

(5)  "Managed care organization" has the meaning assigned by Section 32.039(a).

(5-a)  "Material" means having a natural tendency to influence or to be capable of influencing.

(6)  "Medicaid program" means the state Medicaid program.

(7)  "Medicaid recipient" means an individual on whose behalf a person claims or receives a payment from the Medicaid program or a fiscal agent, without regard to whether the individual was eligible for benefits under the Medicaid program.

(7-a)  "Obligation" means a duty, whether or not fixed, that arises from:

(A)  an express or implied contractual, grantor-grantee, or licensor-licensee relationship;

(B)  a fee-based or similar relationship;

(C)  a statute or regulation; or

(D)  the retention of any overpayment.

(8)  "Physician" means a physician licensed to practice medicine in this state.

(9)  "Provider" means a person who participates in or who has applied to participate in the Medicaid program as a supplier of a product or service and includes:

(A)  a management company that manages, operates, or controls another provider;

(B)  a person, including a medical vendor, that provides a product or service to a provider or to a fiscal agent;

(C)  an employee of a provider;

(D)  a managed care organization; and

(E)  a manufacturer or distributor of a product for which the Medicaid program provides reimbursement.

(10)  "Service" includes care or treatment of a Medicaid recipient.

(11)  "Signed" means to have affixed a signature directly or indirectly by means of handwriting, typewriting, signature stamp, computer impulse, or other means recognized by law.

Xerox Relator Share000002SOT to Relators

(12)  "Unlawful act" means an act declared to be unlawful under Section 36.002.

Added by Acts 1995, 74th Leg., ch. 824, Sec. 1, eff. Sept. 1, 1995.  Amended by Acts 1997, 75th Leg., ch. 1153, Sec. 4.02, eff. Sept. 1, 1997.
Amended by:
         Acts 2005, 79th Leg., Ch. 806, Sec. 1, eff. September 1, 2005.
         Acts 2011, 82nd Leg., R.S., Ch. 398, Sec. 1, eff. September 1, 2011.


**Sec. 36.0011**.  **CULPABLE MENTAL STATE**.  (a)  For purposes of this chapter, a person acts "knowingly" with respect to information if the person:
         (1)  has knowledge of the information;
         (2)  acts with conscious indifference to the truth or falsity of the information; or
         (3)  acts in reckless disregard of the truth or falsity of the information.
     (b)  Proof of the person's specific intent to commit an unlawful act under Section 36.002 is not required in a civil or administrative proceeding to show that a person acted "knowingly" with respect to information under this chapter.

Added by Acts 2005, 79th Leg., Ch. 806, Sec. 2, eff. September 1, 2005.


**Sec. 36.002**.  **UNLAWFUL ACTS**.  A person commits an unlawful act if the person:
         (1)  knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;
         (2)  knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;
         (3)  knowingly applies for and receives a benefit or payment on behalf of another person under the Medicaid program and converts any part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received;
         (4)  knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:
                 (A)  the conditions or operation of a facility in order that the facility may qualify for certification or recertification required by the Medicaid program, including certification or recertification as:

(i) a hospital;

(ii) a nursing facility or skilled nursing facility;

(iii) a hospice;

(iv) an intermediate care facility for the mentally retarded;

(v) an assisted living facility; or

(vi) a home health agency; or

(B) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

(5) except as authorized under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program;

(6) knowingly presents or causes to be presented a claim for payment under the Medicaid program for a product provided or a service rendered by a person who:

(A) is not licensed to provide the product or render the service, if a license is required; or

(B) is not licensed in the manner claimed;

(7) knowingly makes or causes to be made a claim under the Medicaid program for:

(A) a service or product that has not been approved or acquiesced in by a treating physician or health care practitioner;

(B) a service or product that is substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry; or

(C) a product that has been adulterated, debased, mislabeled, or that is otherwise inappropriate;

(8) makes a claim under the Medicaid program and knowingly fails to indicate the type of license and the identification number of the licensed health care provider who actually provided the service;

(9) knowingly enters into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another person in obtaining an unauthorized payment or benefit from the Medicaid program or a fiscal agent;

(10) is a managed care organization that contracts with the Health and Human Services Commission or other state agency to provide or arrange to provide health care benefits or services to individuals eligible under the Medicaid program and knowingly:

Xerox Relator Share000004SOT to Relators

(A)  fails to provide to an individual a health care benefit or service that the organization is required to provide under the contract;

(B)  fails to provide to the commission or appropriate state agency information required to be provided by law, commission or agency rule, or contractual provision; or

(C)  engages in a fraudulent activity in connection with the enrollment of an individual eligible under the Medicaid program in the organization's managed care plan or in connection with marketing the organization's services to an individual eligible under the Medicaid program;

(11)  knowingly obstructs an investigation by the attorney general of an alleged unlawful act under this section;

(12)  knowingly makes, uses, or causes the making or use of a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to this state under the Medicaid program; or

(13)  knowingly engages in conduct that constitutes a violation under Section 32.039(b).

Added by Acts 1995, 74th Leg., ch. 824, Sec. 1, eff. Sept. 1, 1995.  Amended by Acts 1997, 75th Leg., ch. 1153, Sec. 4.03, eff. Sept. 1, 1997;  Acts 1999, 76th Leg., ch. 233, Sec. 4, eff. Sept. 1, 1999.
Amended by:

Acts 2005, 79th Leg., Ch. 806, Sec. 3, eff. September 1, 2005.

Acts 2007, 80th Leg., R.S., Ch. 78, Sec. 1, eff. September 1, 2007.

Acts 2011, 82nd Leg., R.S., Ch. 398, Sec. 2, eff. September 1, 2011.


**Sec. 36.003.  DOCUMENTARY MATERIAL IN POSSESSION OF STATE AGENCY**.  (a)  A state agency, including the Health and Human Services Commission, the Texas Department of Human Services, the Texas Department of Health, the Texas Department of Mental Health and Mental Retardation, or the Department of Protective and Regulatory Services, shall provide the attorney general access to all documentary materials of persons and Medicaid recipients under the Medicaid program to which that agency has access.  Documentary material provided under this subsection is provided to permit investigation of an alleged unlawful act or for use or potential use in an administrative or judicial proceeding.

Xerox Relator Share000005SOT to Relators

(b)  Except as ordered by a court for good cause shown, the office of the attorney general may not produce for inspection or copying or otherwise disclose the contents of documentary material obtained under this section to a person other than:

      (1)  an employee of the attorney general;

      (2)  an agency of this state, the United States, or another state;

      (3)  a criminal district attorney, district attorney, or county attorney of this state;

      (4)  the United States attorney general;

      (5)  a state or federal grand jury;

      (6)  a political subdivision of this state; or

      (7)  a person authorized by the attorney general to receive the information.

Added by Acts 1995, 74th Leg., ch. 824, Sec. 1, eff. Sept. 1, 1995.  Renumbered from Human Resources Code Sec. 36.007 by Acts 1997, 75th Leg., ch. 1153, Sec. 4.01(a), eff. Sept. 1, 1997. Amended by:

      Acts 2005, 79th Leg., Ch. 806, Sec. 4, eff. September 1, 2005.


      Sec. 36.004.  **IMMUNITY**.  Notwithstanding any other law, a person is not civilly or criminally liable for providing access to documentary material under this chapter to:

      (1)  an employee of the attorney general;

      (2)  an agency of this state, the United States, or another state;

      (3)  a criminal district attorney, district attorney, or county attorney of this state;

      (4)  the United States attorney general;

      (5)  a state or federal grand jury;

      (6)  a political subdivision of this state; or

      (7)  a person authorized by the attorney general to receive the information.

Added by Acts 1995, 74th Leg., ch. 824, Sec. 1, eff. Sept. 1, 1995.  Renumbered from Human Resources Code Sec. 36.008 by Acts 1997, 75th Leg., ch. 1153, Sec. 4.01(a), eff. Sept. 1, 1997. Amended by:

      Acts 2005, 79th Leg., Ch. 806, Sec. 5, eff. September 1, 2005.


      Sec. 36.005.  **SUSPENSION OR REVOCATION OF AGREEMENT; PROFESSIONAL DISCIPLINE**.  (a)  A health and human services agency, as defined by Section 531.001, Government Code:

      (1)  shall suspend or revoke:

Xerox Relator Share000006SOT to Relators

(A)  a provider agreement between the agency and a person, other than a person who operates a nursing facility or an ICF-MR facility, found liable under  Section 36.052;  and

(B)  a permit, license, or certification granted by the agency to a person, other than a person who operates a nursing facility or an ICF-MR facility, found liable under Section 36.052;  and

(2)  may suspend or revoke:

(A)  a provider agreement between the agency and a person who operates a nursing facility or an ICF-MR facility and who is found liable under Section 36.052;  or

(B)  a permit, license, or certification granted by the agency to a person who operates a nursing facility or an ICF-MR facility and who is found liable under Section 36.052.

(b)  A provider found liable under Section 36.052 for an unlawful act may not, for a period of 10 years, provide or arrange to provide health care services under the Medicaid program or supply or sell, directly or indirectly, a product to or under the Medicaid program.  The executive commissioner of the Health and Human Services Commission may by rule:

(1)  provide for a period of ineligibility longer than 10 years; or

(2)  grant a provider a full or partial exemption from the period of ineligibility required by this subsection if the executive commissioner finds that enforcement of the full period of ineligibility is harmful to the Medicaid program or a beneficiary of the program.

(b-1)  The period of ineligibility begins on the date on which the determination that the provider is liable becomes final.

(b-2)  Subsections (b) and (b-1) do not apply to a provider who operates a nursing facility or an ICF-MR facility.

(c)  A person licensed by a state regulatory agency who commits an unlawful act is subject to professional discipline under the applicable licensing law or rules adopted under that law.

(d)  For purposes of this section, a person is considered to have been found liable under Section 36.052 if the person is found liable in an action brought under Subchapter C.

Added by Acts 1995, 74th Leg., ch. 824, Sec. 1, eff. Sept. 1, 1995.  Renumbered from Human Resources Code Sec. 36.009 by Acts 1997, 75th Leg., ch. 1153, Sec. 4.01(a), eff. Sept. 1, 1997. Amended by Acts 1997, 75th Leg., ch. 1153, Sec. 4.06, eff. Sept. 1, 1997.
Amended by:
Acts 2005, 79th Leg., Ch. 806, Sec. 6, eff. September 1, 2005.

**Sec. 36.006. APPLICATION OF OTHER LAW**. The application of a civil remedy under this chapter does not preclude the application of another common law, statutory, or regulatory remedy, except that a person may not be liable for a civil remedy under this chapter and civil damages or a penalty under Section 32.039 if the civil remedy and civil damages or penalty are assessed for the same act.

Added by Acts 1995, 74th Leg., ch. 824, Sec. 1, eff. Sept. 1, 1995. Renumbered from Human Resources Code Sec. 36.010 by Acts 1997, 75th Leg., ch. 1153, Sec. 4.01(a), eff. Sept. 1, 1997.

**Sec. 36.007. RECOVERY OF COSTS, FEES, AND EXPENSES**. The attorney general may recover fees, expenses, and costs reasonably incurred in obtaining injunctive relief or civil remedies or in conducting investigations under this chapter, including court costs, reasonable attorney's fees, witness fees, and deposition fees.

Added by Acts 1995, 74th Leg., ch. 824, Sec. 1, eff. Sept. 1, 1995. Renumbered from Human Resources Code Sec. 36.011 by Acts 1997, 75th Leg., ch. 1153, Sec. 4.01(a), eff. Sept. 1, 1997.

**Sec. 36.008. USE OF MONEY RECOVERED**. The legislature, in appropriating money recovered under this chapter, shall consider the requirements of the attorney general and other affected state agencies in investigating Medicaid fraud and enforcing this chapter.

Added by Acts 1995, 74th Leg., ch. 824, Sec. 1, eff. Sept. 1, 1995. Renumbered from Human Resources Code Sec. 36.012 by Acts 1997, 75th Leg., ch. 1153, Sec. 4.01(a), eff. Sept. 1, 1997.

**SUBCHAPTER B. ACTION BY ATTORNEY GENERAL**

**Sec. 36.051. INJUNCTIVE RELIEF**. (a) If the attorney general has reason to believe that a person is committing, has committed, or is about to commit an unlawful act, the attorney general may institute an action for an appropriate order to restrain the person from committing or continuing to commit the act.

(b) An action under this section shall be brought in a district court of Travis County or of a county in which any part of the unlawful act occurred, is occurring, or is about to occur.

Added by Acts 1995, 74th Leg., ch. 824, Sec. 1, eff. Sept. 1, 1995.  Renumbered from Human Resources Code Sec. 36.003 by Acts 1997, 75th Leg., ch. 1153, Sec. 4.01(b), eff. Sept. 1, 1997.


Sec. 36.052.  CIVIL REMEDIES.  (a)  Except as provided by Subsection (c), a person who commits an unlawful act is liable to the state for:

(1)  the amount of any payment or the value of any monetary or in-kind benefit provided under the Medicaid program, directly or indirectly, as a result of the unlawful act, including any payment made to a third party;

(2)  interest on the amount of the payment or the value of the benefit described by Subdivision (1) at the prejudgment interest rate in effect on the day the payment or benefit was received or paid, for the period from the date the benefit was received or paid to the date that the state recovers the amount of the payment or value of the benefit;

(3)  a civil penalty of:

(A)  not less than $5,500 or the minimum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $5,500, and not more than $15,000 or the maximum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $15,000, for each unlawful act committed by the person that results in injury to an elderly person, as defined by Section 48.002(a)(1), a disabled person, as defined by Section 48.002(a)(8)(A), or a person younger than 18 years of age; or

(B)  not less than $5,500 or the minimum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $5,500, and not more than $11,000 or the maximum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $11,000, for each unlawful act committed by the person that does not result in injury to a person described by Paragraph (A); and

(4)  two times the amount of the payment or the value of the benefit described by Subdivision (1).

(b)  In determining the amount of the civil penalty described by Subsection (a)(3), the trier of fact shall consider:

(1)  whether the person has previously violated the provisions of this chapter;

(2)  the seriousness of the unlawful act committed by the person, including the nature, circumstances, extent, and gravity of the unlawful act;

(3)  whether the health and safety of the public or an individual was threatened by the unlawful act;

(4)  whether the person acted in bad faith when the person engaged in the conduct that formed the basis of the unlawful act;  and

Xerox Relator Share000009SOT to Relators

(5)  the amount necessary to deter future unlawful acts.

(c)  The trier of fact may assess a total of not more than two times the amount of a payment or the value of a benefit described by Subsection (a)(1) if the trier of fact finds that:

(1)  the person furnished the attorney general with all information known to the person about the unlawful act not later than the 30th day after the date on which the person first obtained the information; and

(2)  at the time the person furnished all the information to the attorney general, the attorney general had not yet begun an investigation under this chapter.

(d)  An action under this section shall be brought in Travis County or in a county in which any part of the unlawful act occurred.

(e)  The attorney general may:

(1)  bring an action for civil remedies under this section together with a suit for injunctive relief under Section 36.051;  or

(2)  institute an action for civil remedies independently of an action for injunctive relief.

Added by Acts 1995, 74th Leg., ch. 824, Sec. 1, eff. Sept. 1, 1995.  Renumbered from Human Resources Code Sec. 36.004 by Acts 1997, 75th Leg., ch. 1153, Sec. 4.01(b), eff. Sept. 1, 1997. Amended by Acts 1997, 75th Leg., ch. 1153, Sec. 4.04, eff. Sept. 1, 1997.
Amended by:

Acts 2005, 79th Leg., Ch. 806, Sec. 7, eff. September 1, 2005.

Acts 2007, 80th Leg., R.S., Ch. 29, Sec. 1, eff. May 4, 2007.

Acts 2011, 82nd Leg., R.S., Ch. 398, Sec. 3, eff. September 1, 2011.

**Sec. 36.053.  INVESTIGATION**.  (a)  The attorney general may take action under Subsection (b) if the attorney general has reason to believe that:

(1)  a person has information or custody or control of documentary material relevant to the subject matter of an investigation of an alleged unlawful act;

(2)  a person is committing, has committed, or is about to commit an unlawful act;  or

(3)  it is in the public interest to conduct an investigation to ascertain whether a person is committing, has committed, or is about to commit an unlawful act.

(b)  In investigating an unlawful act, the attorney general may:

(1)  require the person to file on a prescribed form a statement in writing, under oath or affirmation, as to all the facts and circumstances concerning the alleged unlawful act and other information considered necessary by the attorney general;

(2)  examine under oath a person in connection with the alleged unlawful act; and

(3)  execute in writing and serve on the person a civil investigative demand requiring the person to produce the documentary material and permit inspection and copying of the material under Section 36.054.

(c)  The office of the attorney general may not release or disclose information that is obtained under Subsection (b)(1) or (2) or any documentary material or other record derived from the information except:

(1)  by court order for good cause shown;

(2)  with the consent of the person who provided the information;

(3)  to an employee of the attorney general;

(4)  to an agency of this state, the United States, or another state;

(5)  to any attorney representing the state under Section 36.055 or in a civil action brought under Subchapter C;

(6)  to a political subdivision of this state; or

(7)  to a person authorized by the attorney general to receive the information.

(d)  The attorney general may use documentary material derived from information obtained under Subsection (b)(1) or (2), or copies of that material, as the attorney general determines necessary in the enforcement of this chapter, including presentation before a court.

(e)  If a person fails to file a statement as required by Subsection (b)(1) or fails to submit to an examination as required by Subsection (b)(2), the attorney general may file in a district court of Travis County a petition for an order to compel the person to file the statement or submit to the examination within a period stated by court order.  Failure to comply with an order entered under this subsection is punishable as contempt.

(f)  An order issued by a district court under this section is subject to appeal to the supreme court.

Added by Acts 1995, 74th Leg., ch. 824, Sec. 1, eff. Sept. 1, 1995.  Renumbered from Human Resources Code Sec. 36.005 by Acts 1997, 75th Leg., ch. 1153, Sec. 4.01(b), eff. Sept. 1, 1997. Amended by Acts 1997, 75th Leg., ch. 1153, Sec. 4.05, eff. Sept. 1, 1997. Amended by:
Acts 2005, 79th Leg., Ch. 806, Sec. 8, eff. September 1, 2005.

Xerox Relator Share000011SOT to Relators

**Sec. 36.054.  CIVIL INVESTIGATIVE DEMAND**.  (a)  An investigative demand must:

    (1)  state the rule or statute under which the alleged unlawful act is being investigated and the general subject matter of the investigation;

    (2)  describe the class or classes of documentary material to be produced with reasonable specificity to fairly indicate the documentary material demanded;

    (3)  prescribe a return date within which the documentary material is to be produced;  and

    (4)  identify an authorized employee of the attorney general to whom the documentary material is to be made available for inspection and copying.

(b)  A civil investigative demand may require disclosure of any documentary material that is discoverable under the Texas Rules of Civil Procedure.

(c)  Service of an investigative demand may be made by:

    (1)  delivering an executed copy of the demand to the person to be served or to a partner, an officer, or an agent authorized by appointment or by law to receive service of process on behalf of that person;

    (2)  delivering an executed copy of the demand to the principal place of business in this state of the person to be served;  or

    (3)  mailing by registered or certified mail an executed copy of the demand addressed to the person to be served at the person's principal place of business in this state or, if the person has no place of business in this state, to a person's principal office or place of business.

(d)  Documentary material demanded under this section shall be produced for inspection and copying during normal business hours at the office of the attorney general or as agreed by the person served and the attorney general.

(e)  The office of the attorney general may not produce for inspection or copying or otherwise disclose the contents of documentary material obtained under this section except:

    (1)  by court order for good cause shown;

    (2)  with the consent of the person who produced the information;

    (3)  to an employee of the attorney general;

    (4)  to an agency of this state, the United States, or another state;

    (5)  to any attorney representing the state under Section 36.055 or in a civil action brought under Subchapter C;

    (6)  to a political subdivision of this state; or

    (7)  to a person authorized by the attorney general to receive the information.

(e-1)  The attorney general shall prescribe reasonable terms and conditions allowing the documentary material to be available for inspection and copying by the person who produced the material or by an authorized representative of that person.  The attorney general may use the documentary material or copies of it as the attorney general determines necessary in the enforcement of this chapter, including presentation before a court.

(f)  A person may file a petition, stating good cause, to extend the return date for the demand or to modify or set aside the demand.  A petition under this section shall be filed in a district court of Travis County and must be filed before the earlier of:

(1)  the return date specified in the demand;  or

(2)  the 20th day after the date the demand is served.

(g)  Except as provided by court order, a person on whom a demand has been served under this section shall comply with the terms of an investigative demand.

(h)  A person who has committed an unlawful act in relation to the Medicaid program in this state has submitted to the jurisdiction of this state and personal service of an investigative demand under this section may be made on the person outside of this state.

(i)  This section does not limit the authority of the attorney general to conduct investigations or to access a person's documentary materials or other information under another state or federal law, the Texas Rules of Civil Procedure, or the Federal Rules of Civil Procedure.

(j)  If a person fails to comply with an investigative demand, or if copying and reproduction of the documentary material demanded cannot be satisfactorily accomplished and the person refuses to surrender the documentary material, the attorney general may file in a district court of Travis County a petition for an order to enforce the investigative demand.

(k)  If a petition is filed under Subsection (j), the court may determine the matter presented and may enter an order to implement this section.

(l)  Failure to comply with a final order entered under Subsection (k) is punishable by contempt.

(m)  A final order issued by a district court under Subsection (k) is subject to appeal to the supreme court.

Added by Acts 1995, 74th Leg., ch. 824, Sec. 1, eff. Sept. 1, 1995.  Renumbered from Human Resources Code Sec. 36.006 by Acts 1997, 75th Leg., ch. 1153, Sec. 4.01(b), eff. Sept. 1, 1997. Amended by:

Acts 2005, 79th Leg., Ch. 806, Sec. 9, eff. September 1, 2005.

Xerox Relator Share000013SOT to Relators

**Sec. 36.055.  ATTORNEY GENERAL AS RELATOR IN FEDERAL ACTION**.
To the extent permitted by 31 U.S.C. Sections 3729-3733, the attorney general may bring an action as relator under 31 U.S.C. Section 3730 with respect to an act in connection with the Medicaid program for which a person may be held liable under 31 U.S.C. Section 3729.  The attorney general may contract with a private attorney to represent the state under this section.

Added by Acts 1997, 75th Leg., ch. 1153, Sec. 4.07(a), eff. Sept. 1, 1997.


### SUBCHAPTER C. ACTION BY PRIVATE PERSONS

**Sec. 36.101.  ACTION BY PRIVATE PERSON AUTHORIZED**.  (a)  A person may bring a civil action for a violation of Section 36.002 for the person and for the state.  The action shall be brought in the name of the person and of the state.

(b)  In an action brought under this subchapter, a person who violates Section 36.002 is liable as provided by Section 36.052.

Added by Acts 1997, 75th Leg., ch. 1153, Sec. 4.08, eff. Sept. 1, 1997.


**Sec. 36.102.  INITIATION OF ACTION**.  (a)  A person bringing an action under this subchapter shall serve a copy of the petition and a written disclosure of substantially all material evidence and information the person possesses on the attorney general in compliance with the Texas Rules of Civil Procedure.

(b)  The petition shall be filed in camera and, except as provided by Subsection (c-1) or (d), shall remain under seal until at least the 180th day after the date the petition is filed or the date on which the state elects to intervene, whichever is earlier.  The petition may not be served on the defendant until the court orders service on the defendant.

(c)  The state may elect to intervene and proceed with the action not later than the 180th day after the date the attorney general receives the petition and the material evidence and information.

(c-1)  At the time the state intervenes, the attorney general may file a motion with the court requesting that the petition remain under seal for an extended period.

(d)  The state may, for good cause shown, move the court to extend the 180-day deadline under Subsection (b) or (c).  A motion under this subsection may be supported by affidavits or other submissions in camera.

(e)  An action under this subchapter may be dismissed before the end of the period during which the petition remains under seal only if the court and the attorney general consent in writing to the dismissal and state their reasons for consenting.

Added by Acts 1997, 75th Leg., ch. 1153, Sec. 4.08, eff. Sept. 1, 1997.
Amended by:
        Acts 2005, 79th Leg., Ch. 806, Sec. 10, eff. September 1, 2005.


**Sec. 36.1021.  STANDARD OF PROOF**.  In an action under this subchapter, the state or person bringing the action must establish each element of the action, including damages, by a preponderance of the evidence.

Added by Acts 2007, 80th Leg., R.S., Ch. 29, Sec. 2, eff. May 4, 2007.


**Sec. 36.103.  ANSWER BY DEFENDANT**.  A defendant is not required to file in accordance with the Texas Rules of Civil Procedure an answer to a petition filed under this subchapter until the petition is unsealed and served on the defendant.

Added by Acts 1997, 75th Leg., ch. 1153, Sec. 4.08, eff. Sept. 1, 1997.
Amended by:
        Acts 2005, 79th Leg., Ch. 806, Sec. 11, eff. September 1, 2005.


**Sec. 36.104.  STATE DECISION; CONTINUATION OF ACTION**.  (a)  Not later than the last day of the period prescribed by Section 36.102(c) or an extension of that period as provided by Section 36.102(d), the state shall:
        (1)  proceed with the action; or
        (2)  notify the court that the state declines to take over the action.
    (b)  If the state declines to take over the action, the person bringing the action may proceed without the state's participation.  On request by the state, the state is entitled to be served with copies of all pleadings filed in the action and be provided at the state's expense with copies of all deposition transcripts.  If the person bringing the action proceeds without the state's participation, the court, without limiting the status and right of that person, may permit the state to intervene at a later date on a showing of good cause.

Added by Acts 1997, 75th Leg., ch. 1153, Sec. 4.08, eff. Sept. 1, 1997.

Xerox Relator Share000015SOT to Relators

Amended by:

Acts 2005, 79th Leg., Ch. 806, Sec. 12, eff. September 1, 2005.
Acts 2007, 80th Leg., R.S., Ch. 29, Sec. 3, eff. May 4, 2007.
Acts 2007, 80th Leg., R.S., Ch. 29, Sec. 4, eff. May 4, 2007.


**Sec. 36.105.  REPRESENTATION OF STATE BY PRIVATE ATTORNEY**.  The attorney general may contract with a private attorney to represent the state in an action under this subchapter with which the state elects to proceed.

Added by Acts 1997, 75th Leg., ch. 1153, Sec. 4.08, eff. Sept. 1, 1997.


**Sec. 36.106.  INTERVENTION BY OTHER PARTIES PROHIBITED**.  A person other than the state may not intervene or bring a related action based on the facts underlying a pending action brought under this subchapter.

Added by Acts 1997, 75th Leg., ch. 1153, Sec. 4.08, eff. Sept. 1, 1997.


**Sec. 36.107.  RIGHTS OF PARTIES IF STATE CONTINUES ACTION**.  (a)  If the state proceeds with the action, the state has the primary responsibility for prosecuting the action and is not bound by an act of the person bringing the action.  The person bringing the action has the right to continue as a party to the action, subject to the limitations set forth by this section.

(b)  The state may dismiss the action notwithstanding the objections of the person bringing the action if:

(1)  the attorney general notifies the person that the state has filed a motion to dismiss;  and

(2)  the court provides the person with an opportunity for a hearing on the motion.

(c)  The state may settle the action with the defendant notwithstanding the objections of the person bringing the action if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances.  On a showing of good cause, the hearing may be held in camera.

(d)  On a showing by the state that unrestricted participation during the course of the litigation by the person bringing the action would interfere with or unduly delay the state's

prosecution of the case, or would be repetitious, irrelevant, or for purposes of harassment, the court may impose limitations on the person's participation, including:

        (1)  limiting the number of witnesses the person may call;

        (2)  limiting the length of the testimony of witnesses called by the person;

        (3)  limiting the person's cross-examination of witnesses;  or

        (4)  otherwise limiting the participation by the person in the litigation.

      (e)  On a showing by the defendant that unrestricted participation during the course of the litigation by the person bringing the action would be for purposes of harassment or would cause the defendant undue burden or unnecessary expense, the court may limit the participation by the person in the litigation.

Added by Acts 1997, 75th Leg., ch. 1153, Sec. 4.08, eff. Sept. 1, 1997.


      **Sec. 36.108.  STAY OF CERTAIN DISCOVERY**.  (a)  On a showing by the state that certain actions of discovery by the person bringing the action would interfere with the state's investigation or prosecution of a criminal or civil matter arising out of the same facts, the court may stay the discovery for a period not to exceed 60 days.

      (b)  The court shall hear a motion to stay discovery under this section in camera.

      (c)  The court may extend the period prescribed by Subsection (a) on a further showing in camera that the state has pursued the criminal or civil investigation or proceedings with reasonable diligence and that any proposed discovery in the civil action will interfere with the ongoing criminal or civil investigation or proceedings.

Added by Acts 1997, 75th Leg., ch. 1153, Sec. 4.08, eff. Sept. 1, 1997.


      **Sec. 36.109.  PURSUIT OF ALTERNATE REMEDY BY STATE**.  (a) Notwithstanding Section 36.101, the state may elect to pursue the state's claim through any alternate remedy available to the state, including any administrative proceeding to determine an administrative penalty.  If an alternate remedy is pursued in another proceeding, the person bringing the action has the same rights in the other proceeding as the person would have had if the action had continued under this subchapter.

      (b)  A finding of fact or conclusion of law made in the other proceeding that has become final is conclusive on all parties to an action under this subchapter.  For purposes of this subsection, a finding or conclusion is final if:

Xerox Relator Share000017SOT to Relators

(1)  the finding or conclusion has been finally determined on appeal to the appropriate court;

(2)  no appeal has been filed with respect to the finding or conclusion and all time for filing an appeal has expired;  or

(3)  the finding or conclusion is not subject to judicial review.

Added by Acts 1997, 75th Leg., ch. 1153, Sec. 4.08, eff. Sept. 1, 1997.


**Sec. 36.110.  AWARD TO PRIVATE PLAINTIFF**.  (a)  If the state proceeds with an action under this subchapter, the person bringing the action is entitled, except as provided by Subsection (b), to receive at least 15 percent but not more than 25 percent of the proceeds of the action, depending on the extent to which the person substantially contributed to the prosecution of the action.

(a-1)  If the state does not proceed with an action under this subchapter, the person bringing the action is entitled, except as provided by Subsection (b), to receive at least 25 percent but not more than 30 percent of the proceeds of the action.  The entitlement of a person under this subsection is not affected by any subsequent intervention in the action by the state in accordance with Section 36.104(b).

(b)  If the court finds that the action is based primarily on disclosures of specific information, other than information provided by the person bringing the action, relating to allegations or transactions in a criminal or civil hearing, in a legislative or administrative report, hearing, audit, or investigation, or from the news media, the court may award the amount the court considers appropriate but not more than seven percent of the proceeds of the action.  The court shall consider the significance of the information and the role of the person bringing the action in advancing the case to litigation.

(c)  A payment to a person under this section shall be made from the proceeds of the action.  A person receiving a payment under this section is also entitled to receive from the defendant an amount for reasonable expenses, reasonable attorney's fees, and costs that the court finds to have been necessarily incurred.  The court's determination of expenses, fees, and costs to be awarded under this subsection shall be made only after the defendant has been found liable in the action or the state settles an action with a defendant that the court determined, after a hearing, was fair, adequate, and reasonable in accordance with Section 36.107(c).

(d)  In this section, "proceeds of the action" includes proceeds of a settlement of the action.

Xerox Relator Share000018SOT to Relators

Added by Acts 1997, 75th Leg., ch. 1153, Sec. 4.08, eff. Sept. 1, 1997.
Amended by:

> Acts 2005, 79th Leg., Ch. 806, Sec. 13, eff. September 1, 2005.
> Acts 2007, 80th Leg., R.S., Ch. 29, Sec. 5, eff. May 4, 2007.
> Acts 2011, 82nd Leg., R.S., Ch. 398, Sec. 4, eff. September 1, 2011.


Sec. 36.111.  REDUCTION OF AWARD.  (a)  If the court finds that the action was brought by a person who planned and initiated the violation of Section 36.002 on which the action was brought, the court may, to the extent the court considers appropriate, reduce the share of the proceeds of the action the person would otherwise receive under Section 36.110, taking into account the person's role in advancing the case to litigation and any relevant circumstances pertaining to the violation.

(b)  If the person bringing the action is convicted of criminal conduct arising from the person's role in the violation of Section 36.002, the court shall dismiss the person from the civil action and the person may not receive any share of the proceeds of the action.  A dismissal under this subsection does not prejudice the right of the state to continue the action.

Added by Acts 1997, 75th Leg., ch. 1153, Sec. 4.08, eff. Sept. 1, 1997.


Sec. 36.112.  AWARD TO DEFENDANT FOR FRIVOLOUS ACTION.  Chapter 105, Civil Practice and Remedies Code, applies in an action under this subchapter with which the state proceeds.

Added by Acts 1997, 75th Leg., ch. 1153, Sec. 4.08, eff. Sept. 1, 1997.


Sec. 36.113.  CERTAIN ACTIONS BARRED.  (a)  A person may not bring an action under this subchapter that is based on allegations or transactions that are the subject of a civil suit or an administrative penalty proceeding in which the state is already a party.

(b)  A person may not bring an action under this subchapter that is based on the public disclosure of allegations or transactions in a criminal or civil hearing in which the state or an agent of the state is a party, in a legislative or administrative report, hearing, audit, or investigation, or from the news media, unless the person bringing the action is an original source of the information.  In this subsection, "original source" means an individual who:

(1) has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the state before filing an action under this subchapter that is based on the information; or

(2) has knowledge that is independent of and materially adds to the publicly disclosed allegations and who has voluntarily provided the information to the state before filing an action under this subchapter that is based on the information.

(c) Before dismissing an action as barred under this section, the court shall give the attorney general an opportunity to oppose the dismissal.

Added by Acts 1997, 75th Leg., ch. 1153, Sec. 4.08, eff. Sept. 1, 1997.
Amended by:

Acts 2011, 82nd Leg., R.S., Ch. 398, Sec. 5, eff. September 1, 2011.


**Sec. 36.114. STATE NOT LIABLE FOR CERTAIN EXPENSES**. The state is not liable for expenses that a person incurs in bringing an action under this subchapter.

Added by Acts 1997, 75th Leg., ch. 1153, Sec. 4.08, eff. Sept. 1, 1997.


**Sec. 36.115. RETALIATION AGAINST PERSON PROHIBITED**. (a) A person, including an employee, contractor, or agent, who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of a lawful act taken by the person in furtherance of an action under this subchapter, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this subchapter, or other efforts taken by the person to stop one or more violations of Section 36.002 is entitled to:

(1) reinstatement with the same seniority status the person would have had but for the discrimination; and

(2) not less than two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees.

(b) A person may bring an action in the appropriate district court for the relief provided in this section.

Added by Acts 1997, 75th Leg., ch. 1153, Sec. 4.08, eff. Sept. 1, 1997.
Amended by:

Xerox Relator Share000020SOT to Relators

Acts 2011, 82nd Leg., R.S., Ch. 398, Sec. 6, eff. September 1, 2011.

Acts 2011, 82nd Leg., R.S., Ch. 398, Sec. 7, eff. September 1, 2011.


**Sec. 36.116.  SOVEREIGN IMMUNITY NOT WAIVED**.  Except as provided by Section 36.112, this subchapter does not waive sovereign immunity.

Added by Acts 1997, 75th Leg., ch. 1153, Sec. 4.08, eff. Sept. 1, 1997.


**Sec. 36.117.  ATTORNEY GENERAL COMPENSATION**.  The office of the attorney general may retain a reasonable portion of recoveries under this subchapter, not to exceed amounts specified in the General Appropriations Act, for the administration of this subchapter.

Added by Acts 1997, 75th Leg., ch. 1153, Sec. 4.08, eff. Sept. 1, 1997.


**SUBCHAPTER D.  REVOCATION OF CERTAIN OCCUPATIONAL LICENSES**

**Sec. 36.132.  REVOCATION OF LICENSES**.  (a)  In this section:

(1)  "License" means a license, certificate, registration, permit, or other authorization that:

(A)  is issued by a licensing authority;

(B)  is subject before expiration to suspension, revocation, forfeiture, or termination by an issuing licensing authority;  and

(C)  must be obtained before a person may practice or engage in a particular business, occupation, or profession.

(2)  "Licensing authority" means:

(A)  the Texas Medical Board;

(B)  the State Board of Dental Examiners;

(C)  the Texas State Board of Examiners of Psychologists;

(D)  the Texas State Board of Social Worker Examiners;

(E)  the Texas Board of Nursing;

(F)  the Texas Board of Physical Therapy Examiners;

(G)  the Texas Board of Occupational Therapy Examiners; or

(H)  another state agency authorized to regulate a provider who receives or is eligible to receive payment for a health care service under the Medicaid program.

(b)  A licensing authority shall revoke a license issued by the authority to a person if the person is convicted of a felony under Section 35A.02, Penal Code.  In revoking the license, the licensing authority shall comply with all procedures generally applicable to the licensing authority in revoking licenses.

Added by Acts 1997, 75th Leg., ch. 1153, Sec. 4.09, eff. Sept. 1, 1997.  Amended by Acts 2003, 78th Leg., ch. 553, Sec. 2.012, eff. Feb. 1, 2004.
Amended by:
      Acts 2005, 79th Leg., Ch. 806, Sec. 15, eff. September 1, 2005.
      Acts 2007, 80th Leg., R.S., Ch. 889, Sec. 70, eff. September 1, 2007.

Xerox Relator Share000022SOT to Relators

# TAB 2

GOVERNMENT CODE

TITLE 3. LEGISLATIVE BRANCH

SUBTITLE B. LEGISLATION

CHAPTER 311. CODE CONSTRUCTION ACT

SUBCHAPTER A. GENERAL PROVISIONS

Sec. 311.001.  SHORT TITLE.  This chapter may be cited as the Code
Construction Act.

Acts 1985, 69th Leg., ch. 479, Sec. 1, eff. Sept. 1, 1985.


Sec. 311.002.  APPLICATION.  This chapter applies to:
        (1)  each code enacted by the 60th or a subsequent legislature as
part of the state's continuing statutory revision program;
        (2)  each amendment, repeal, revision, and reenactment of a code
or code provision by the 60th or a subsequent legislature;
        (3)  each repeal of a statute by a code;  and
        (4)  each rule adopted under a code.

Acts 1985, 69th Leg., ch. 479, Sec. 1, eff. Sept. 1, 1985.


Sec. 311.003.  RULES NOT EXCLUSIVE.  The rules provided in this
chapter are not exclusive but are meant to describe and clarify common
situations in order to guide the preparation and construction of codes.

Acts 1985, 69th Leg., ch. 479, Sec. 1, eff. Sept. 1, 1985.


Sec. 311.004.  CITATION OF CODES.  A code may be cited by its name
preceded by the specific part concerned.  Examples of citations are:
        (1)  Title 1, Business & Commerce Code;
        (2)  Chapter 5, Business & Commerce Code;
        (3)  Section 9.304, Business & Commerce Code;
        (4)  Section 15.06(a), Business & Commerce Code;  and
        (5)  Section 17.18(b)(1)(B)(ii), Business & Commerce Code.

Acts 1985, 69th Leg., ch. 479, Sec. 1, eff. Sept. 1, 1985.  Amended by Acts
1985, 69th Leg., ch. 117, Sec. 13(b), eff. Sept. 1, 1985.

The following section was amended by the 89th Legislature. Pending publication of the current statutes, see H.B. 229, 89th Legislature, Regular Session, for amendments affecting the following section.

Sec. 311.005.  GENERAL DEFINITIONS.  The following definitions apply unless the statute or context in which the word or phrase is used requires a different definition:

(1)  "Oath" includes affirmation.

(2)  "Person" includes corporation, organization, government or governmental subdivision or agency, business trust, estate, trust, partnership, association, and any other legal entity.

(3)  "Population" means the population shown by the most recent federal decennial census.

(4)  "Property" means real and personal property.

(5)  "Rule" includes regulation.

(6)  "Signed" includes any symbol executed or adopted by a person with present intention to authenticate a writing.

(7)  "State," when referring to a part of the United States, includes any state, district, commonwealth, territory, and insular possession of the United States and any area subject to the legislative authority of the United States of America.

(8)  "Swear" includes affirm.

(9)  "United States" includes a department, bureau, or other agency of the United States of America.

(10)  "Week" means seven consecutive days.

(11)  "Written" includes any representation of words, letters, symbols, or figures.

(12)  "Year" means 12 consecutive months.

(13)  "Includes" and "including" are terms of enlargement and not of limitation or exclusive enumeration, and use of the terms does not create a presumption that components not expressed are excluded.

Acts 1985, 69th Leg., ch. 479, Sec. 1, eff. Sept. 1, 1985.  Amended by Acts 1989, 71st Leg., ch. 340, Sec. 1, eff. Aug. 28, 1989.


Sec. 311.006.  INTERNAL REFERENCES.  In a code:

(1)  a reference to a title, chapter, or section without further identification is a reference to a title, chapter, or section of the code; and

(2)  a reference to a subtitle, subchapter, subsection, subdivision, paragraph, or other numbered or lettered unit without further identification is a reference to a unit of the next larger unit of the code in which the reference appears.

Added by Acts 1993, 73rd Leg., ch. 131, Sec. 1, eff. May 11, 1993.


SUBCHAPTER B. CONSTRUCTION OF WORDS AND PHRASES

Sec. 311.011.  COMMON AND TECHNICAL USAGE OF WORDS.  (a)  Words and phrases shall be read in context and construed according to the rules of grammar and common usage.

(b)  Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly.

Acts 1985, 69th Leg., ch. 479, Sec. 1, eff. Sept. 1, 1985.


Sec. 311.012.  TENSE, NUMBER, AND GENDER.  (a)  Words in the present tense include the future tense.

(b)  The singular includes the plural and the plural includes the singular.

(c)  Words of one gender include the other genders.

Acts 1985, 69th Leg., ch. 479, Sec. 1, eff. Sept. 1, 1985.


Sec. 311.013.  AUTHORITY AND QUORUM OF PUBLIC BODY.  (a)  A grant of authority to three or more persons as a public body confers the authority on a majority of the number of members fixed by statute.

(b)  A quorum of a public body is a majority of the number of members fixed by statute.

Acts 1985, 69th Leg., ch. 479, Sec. 1, eff. Sept. 1, 1985.


Sec. 311.014.  COMPUTATION OF TIME.  (a)  In computing a period of days, the first day is excluded and the last day is included.

(b)  If the last day of any period is a Saturday, Sunday, or legal holiday, the period is extended to include the next day that is not a Saturday, Sunday, or legal holiday.

(c)  If a number of months is to be computed by counting the months from a particular day, the period ends on the same numerical day in the

concluding month as the day of the month from which the computation is begun, unless there are not that many days in the concluding month, in which case the period ends on the last day of that month.

Acts 1985, 69th Leg., ch. 479, Sec. 1, eff. Sept. 1, 1985.


Sec. 311.015. REFERENCE TO A SERIES. If a statute refers to a series of numbers or letters, the first and last numbers or letters are included.

Acts 1985, 69th Leg., ch. 479, Sec. 1, eff. Sept. 1, 1985.


Sec. 311.016. "MAY," "SHALL," "MUST," ETC. The following constructions apply unless the context in which the word or phrase appears necessarily requires a different construction or unless a different construction is expressly provided by statute:
        (1)  "May" creates discretionary authority or grants permission or a power.
        (2)  "Shall" imposes a duty.
        (3)  "Must" creates or recognizes a condition precedent.
        (4)  "Is entitled to" creates or recognizes a right.
        (5)  "May not" imposes a prohibition and is synonymous with "shall not."
        (6)  "Is not entitled to" negates a right.
        (7)  "Is not required to" negates a duty or condition precedent.

Added by Acts 1997, 75th Leg., ch. 220, Sec. 1, eff. May 23, 1997.


SUBCHAPTER C. CONSTRUCTION OF STATUTES

Sec. 311.021. INTENTION IN ENACTMENT OF STATUTES. In enacting a statute, it is presumed that:
        (1)  compliance with the constitutions of this state and the United States is intended;
        (2)  the entire statute is intended to be effective;
        (3)  a just and reasonable result is intended;
        (4)  a result feasible of execution is intended;  and
        (5)  public interest is favored over any private interest.

Acts 1985, 69th Leg., ch. 479, Sec. 1, eff. Sept. 1, 1985.

Sec. 311.022.  PROSPECTIVE OPERATION OF STATUTES.  A statute is presumed to be prospective in its operation unless expressly made retrospective.

Acts 1985, 69th Leg., ch. 479, Sec. 1, eff. Sept. 1, 1985.


Sec. 311.023.  STATUTE CONSTRUCTION AIDS.  In construing a statute, whether or not the statute is considered ambiguous on its face, a court may consider among other matters the:
        (1)  object sought to be attained;
        (2)  circumstances under which the statute was enacted;
        (3)  legislative history;
        (4)  common law or former statutory provisions, including laws on the same or similar subjects;
        (5)  consequences of a particular construction;
        (6)  administrative construction of the statute;  and
        (7)  title (caption), preamble, and emergency provision.

Acts 1985, 69th Leg., ch. 479, Sec. 1, eff. Sept. 1, 1985.


Sec. 311.024.  HEADINGS.  The heading of a title, subtitle, chapter, subchapter, or section does not limit or expand the meaning of a statute.

Acts 1985, 69th Leg., ch. 479, Sec. 1, eff. Sept. 1, 1985.


Sec. 311.025.  IRRECONCILABLE STATUTES AND AMENDMENTS.  (a)  Except as provided by Section 311.031(d), if statutes enacted at the same or different sessions of the legislature are irreconcilable, the statute latest in date of enactment prevails.
        (b)  Except as provided by Section 311.031(d), if amendments to the same statute are enacted at the same session of the legislature, one amendment without reference to another, the amendments shall be harmonized, if possible, so that effect may be given to each.  If the amendments are irreconcilable, the latest in date of enactment prevails.
        (c)  In determining whether amendments are irreconcilable, text that is reenacted because of the requirement of Article III, Section 36, of the Texas Constitution is not considered to be irreconcilable with additions or omissions in the same text made by another amendment.  Unless clearly indicated to the contrary, an amendment that reenacts text in compliance with that constitutional requirement does not indicate legislative intent

that the reenacted text prevail over changes in the same text made by another amendment, regardless of the relative dates of enactment.

(d)  In this section, the date of enactment is the date on which the last legislative vote is taken on the bill enacting the statute.

(e)  If the journals or other legislative records fail to disclose which of two or more bills in conflict is latest in date of enactment, the date of enactment of the respective bills is considered to be, in order of priority:

(1)  the date on which the last presiding officer signed the bill;

(2)  the date on which the governor signed the bill;  or

(3)  the date on which the bill became law by operation of law.

Acts 1985, 69th Leg., ch. 479, Sec. 1, eff. Sept. 1, 1985.  Amended by Acts 1989, 71st Leg., ch. 340, Sec. 2, eff. Aug. 28, 1989;  Acts 1997, 75th Leg., ch. 220, Sec. 2, eff. May 23, 1997.


Sec. 311.026.  SPECIAL OR LOCAL PROVISION PREVAILS OVER GENERAL.  (a) If a general provision conflicts with a special or local provision, the provisions shall be construed, if possible, so that effect is given to both.

(b)  If the conflict between the general provision and the special or local provision is irreconcilable, the special or local provision prevails as an exception to the general provision, unless the general provision is the later enactment and the manifest intent is that the general provision prevail.

Acts 1985, 69th Leg., ch. 479, Sec. 1, eff. Sept. 1, 1985.


Sec. 311.027.  STATUTORY REFERENCES.  Unless expressly provided otherwise, a reference to any portion of a statute or rule applies to all reenactments, revisions, or amendments of the statute or rule.

Acts 1985, 69th Leg., ch. 479, Sec. 1, eff. Sept. 1, 1985.  Amended by Acts 1993, 73rd Leg., ch. 131, Sec. 2, eff. May 11, 1993.


Sec. 311.028.  UNIFORM CONSTRUCTION OF UNIFORM ACTS.  A uniform act included in a code shall be construed to effect its general purpose to make uniform the law of those states that enact it.

Acts 1985, 69th Leg., ch. 479, Sec. 1, eff. Sept. 1, 1985.

Sec. 311.029.  ENROLLED BILL CONTROLS.  If the language of the enrolled bill version of a statute conflicts with the language of any subsequent printing or reprinting of the statute, the language of the enrolled bill version controls.

Acts 1985, 69th Leg., ch. 479, Sec. 1, eff. Sept. 1, 1985.


Sec. 311.030.  REPEAL OF REPEALING STATUTE.  The repeal of a repealing statute does not revive the statute originally repealed nor impair the effect of any saving provision in it.

Acts 1985, 69th Leg., ch. 479, Sec. 1, eff. Sept. 1, 1985.


Sec. 311.031.  SAVING PROVISIONS.  (a)  Except as provided by Subsection (b), the reenactment, revision, amendment, or repeal of a statute does not affect:

(1)  the prior operation of the statute or any prior action taken under it;

(2)  any validation, cure, right, privilege, obligation, or liability previously acquired, accrued, accorded, or incurred under it;

(3)  any violation of the statute or any penalty, forfeiture, or punishment incurred under the statute before its amendment or repeal;  or

(4)  any investigation, proceeding, or remedy concerning any privilege, obligation, liability, penalty, forfeiture, or punishment;  and the investigation, proceeding, or remedy may be instituted, continued, or enforced, and the penalty, forfeiture, or punishment imposed, as if the statute had not been repealed or amended.

(b)  If the penalty, forfeiture, or punishment for any offense is reduced by a reenactment, revision, or amendment of a statute, the penalty, forfeiture, or punishment, if not already imposed, shall be imposed according to the statute as amended.

(c)  The repeal of a statute by a code does not affect an amendment, revision, or reenactment of the statute by the same legislature that enacted the code.  The amendment, revision, or reenactment is preserved and given effect as part of the code provision that revised the statute so amended, revised, or reenacted.

(d)  If any provision of a code conflicts with a statute enacted by the same legislature that enacted the code, the statute controls.

Acts 1985, 69th Leg., ch. 479, Sec. 1, eff. Sept. 1, 1985.

Sec. 311.032.  SEVERABILITY OF STATUTES.  (a)  If any statute contains a provision for severability, that provision prevails in interpreting that statute.

(b)  If any statute contains a provision for nonseverability, that provision prevails in interpreting that statute.

(c)  In a statute that does not contain a provision for severability or nonseverability, if any provision of the statute or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the statute that can be given effect without the invalid provision or application, and to this end the provisions of the statute are severable.

Acts 1985, 69th Leg., ch. 479, Sec. 1, eff. Sept. 1, 1985.


Sec. 311.034.  WAIVER OF SOVEREIGN IMMUNITY.  In order to preserve the legislature's interest in managing state fiscal matters through the appropriations process, a statute shall not be construed as a waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language.  In a statute, the use of "person," as defined by Section 311.005 to include governmental entities, does not indicate legislative intent to waive sovereign immunity unless the context of the statute indicates no other reasonable construction.  Statutory prerequisites to a suit, including the provision of notice, are jurisdictional requirements in all suits against a governmental entity.

Added by Acts 2001, 77th Leg., ch. 1158, Sec. 8, eff. June 15, 2001.
Amended by:
Acts 2005, 79th Leg., Ch. 1150 (H.B. 2988), Sec. 1, eff. September 1, 2005.


Sec. 311.035.  CONSTRUCTION OF STATUTE OR RULE INVOLVING CRIMINAL OFFENSE OR PENALTY.  (a) In this section, "actor" and "element of offense" have the meanings assigned by Section 1.07, Penal Code.

(b)  Except as provided by Subsection (c), a statute or rule that creates or defines a criminal offense or penalty shall be construed in favor of the actor if any part of the statute or rule is ambiguous on its face or as applied to the case, including:

(1)  an element of offense; or
(2)  the penalty to be imposed.

(c)  Subsection (b) does not apply to a criminal offense or penalty under the Penal Code or under the Texas Controlled Substances Act.

(d)  The ambiguity of a part of a statute or rule to which this section applies is a matter of law to be resolved by the judge.

Added by Acts 2015, 84th Leg., R.S., Ch. 1251 (H.B. 1396), Sec. 4, eff. September 1, 2015.


Sec. 311.036.  CONSTRUCTION OF ABORTION STATUTES.  (a)  A statute that regulates or prohibits abortion may not be construed to repeal any other statute that regulates or prohibits abortion, either wholly or partly, unless the repealing statute explicitly states that it is repealing the other statute.

(b)  A statute may not be construed to restrict a political subdivision from regulating or prohibiting abortion in a manner that is at least as stringent as the laws of this state unless the statute explicitly states that political subdivisions are prohibited from regulating or prohibiting abortion in the manner described by the statute.

(c)  Every statute that regulates or prohibits abortion is severable in each of its applications to every person and circumstance.  If any statute that regulates or prohibits abortion is found by any court to be unconstitutional, either on its face or as applied, then all applications of that statute that do not violate the United States Constitution and Texas Constitution shall be severed from the unconstitutional applications and shall remain enforceable, notwithstanding any other law, and the statute shall be interpreted as if containing language limiting the statute's application to the persons, group of persons, or circumstances for which the statute's application will not violate the United States Constitution and Texas Constitution.

Added by Acts 2021, 87th Leg., R.S., Ch. 62 (S.B. 8), Sec. 5, eff. September 1, 2021.

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kaycie Pressley on behalf of Caitlyn Silhan
Bar No. 24072879
kpressley@waterskraus.com
Envelope ID: 104234154
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Brief for Relator-Appellees
Status as of 8/12/2025 7:07 AM CST

Associated Case Party: State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Brian Vanderzanden | | brian.vanderzanden@oag.texas.gov | 8/11/2025 4:55:55 PM | SENT |
| Jonathan Rohde | | jonathan.rohde@oag.texas.gov | 8/11/2025 4:55:55 PM | SENT |
| Brittany Peters | | Brittany.Peters@oag.texas.gov | 8/11/2025 4:55:55 PM | SENT |
| Lynette Karch-Schroder | | lynette.karch-schroder@oag.texas.gov | 8/11/2025 4:55:55 PM | SENT |

Associated Case Party: Alexandra Alvarez

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| James Tucker | 20272020 | rusty@rustytuckerlaw.com | 8/11/2025 4:55:55 PM | SENT |

Associated Case Party: Joshua LaFountain

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| James Tucker | 20272020 | rusty@rustytuckerlaw.com | 8/11/2025 4:55:55 PM | SENT |

Associated Case Party: Christine Ellis

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Caitlyn Silhan | 24072879 | csilhan@waterskraus.com | 8/11/2025 4:55:55 PM | SENT |
| James Moriarty | 14459000 | jim@moriarty.com | 8/11/2025 4:55:55 PM | SENT |
| Charles S.Siegel | | csiegel@waterskraus.com | 8/11/2025 4:55:55 PM | SENT |